Mikael HUGENBERG, Appellant,

v.

WEST AMERICAN INSURANCE
COMPANY/OHIO CASUALTY
GROUP, Appellee.

Donald Fritz; Peggy Fritz; and Bradley J. Fritz, a Minor, by and through his Parents, Donald and Peggy Fritz, Appellants,

v.

Mikael J. Hugenberg, a Minor; Jack Hugenberg; Susan Hugenberg; Randy Dauwe; Thomas Honebrink; and The Highland Cemetery, Appellees.

Donald Fritz; Peggy Fritz; and Bradley J. Fritz, a Minor, by and through his Parents, Donald and Peggy Fritz, Appellants

v.

West American Insurance Company/Ohio Casualty Group; Mikael J. Hugenberg, a Minor; Jack Hugenberg; Susan Hugenberg; Randy Dauwe; Thomas Honebrink; and The Highland Cemetery, Appellees.

Donald Fritz; Peggy Fritz; and Bradley J. Fritz, a Minor, by and through his Parents, Donald and Peggy Fritz, Appellants

v.

Liberty Mutual Insurance Company; Mikael J. Hugenberg, a Minor; Jack Hugenberg; Susan Hugenberg; Randy Dauwe; Thomas Honebrink; and The Highland Cemetery, Appellees.

Jack Hugenberg; Susan Hugenberg; Appellants and Mikael J. Hugenberg, a Minor, by and through his Parents, Jack and Susan Hugenberg, Appellants

v.

Liberty Mutual Insurance Company;

Peggy Fritz; Donald Fritz; Bradley J. Fritz, a Minor, by and through his Parents, Donald and Peggy Fritz; Randy Dauwe; Thomas Honebrink; and The Highland Cemetery, Appellees.

Nos. 2004–CA–001472–MR, 2004–CA–001490–MR, 2004–CA–001491–MR, 2004–CA–002127–MR, 2004–CA–002172–MR.

Court of Appeals of Kentucky.

April 7, 2006.

E. André Busald, Florence, KY, for appellants and appellees Jack Hugenberg; Susan Hugenberg; and Mikael J. Hugenberg, a Minor, by and through his Parents, Jack and Susan Hugenberg.

Robert E. Sanders, Delana S. Pierce, Covington, KY, for appellants and appellees Donald Fritz; Peggy Fritz; and Bradley J. Fritz, a Minor, by and through his Parents, Donald and Peggy Fritz.

Jeffrey A. Stepner, Donald L. Stepner, Covington, KY, for appellee West American Insurance Company/Ohio Casualty Group.

Michael P. Foley, Cincinnati, OH, for appellee Liberty Mutual Insurance Company.

Before BARBER, MINTON, and TACKETT, Judges.

*OPINION*

MINTON, Judge.

The matter before us concerns five separate appeals. They have not been consolidated, but we heard them together because all arise from three interrelated Kenton Circuit Court cases concerning the same motor vehicle accident. We affirm the summary judgments entered in Case Nos. 2004–CA–001490–MR, 2004–CA–001472–MR, and 2004–CA–001491–MR. We reverse the summary judgments entered in Case Nos. 2004–CA–002127–MR and 2004–CA–002172–MR and remand to the trial court for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY.

On Saturday, September 18, 1999, fifteen-year-old Mikael Hugenberg (Mikael)[1] convinced Randy Dauwe (Dauwe) to buy him two twelve-packs of beer. Dauwe was the boyfriend of Annie Hugenberg (Annie), Mikael's older sister. Dauwe left the beer in the trunk of his unlocked car, which was parked on the street near the Hugenbergs' house, and departed with Annie in her car. Although Mikael had no driver's license or learner's permit, he decided that he would drive Dauwe's car rather than walk to his destination carrying the beer.[2] That night, Mikael, Bradley Fritz (Brad),[3] and Blake Gehring (Gehring) each drank some of the beer at the home of Ryan Arlinghaus (Arlinghaus), whose parents were out for the evening.[4] Mikael then drove Brad and Gehring to another teen gathering in The Highland Cemetery (the cemetery) near the resident caretaker's house. Mikael, Brad, and Gehring may have drunk more beer there. Later, Mikael drove through the cemetery with Brad and Gehring as passengers when he lost control of the car, hitting a tree. As a result of the crash, Brad suffered serious and

---

1. Mikael's name has been misspelled at times in the record as "Michael."

2. There is some dispute over how Mikael obtained Dauwe's car keys, which will be discussed below. Mikael did not want to carry the beer because it was bagged in clear plastic, which did not adequately conceal the contents.

3. We have referred to Bradley Fritz as "Brad" because this is the nickname used in the briefs filed by his parents on their own behalf and on his behalf.

4. Brad, Gehring, and Arlinghaus were all fifteen at the time.

permanent injuries, including brain damage.

Brad's parents, Donald and Peggy Fritz (the Fritzes), filed suit on their own behalf and on Brad's behalf demanding judgment for Brad's injuries against Mikael; his parents, Jack and Susan Hugenberg (the Hugenbergs); Dauwe; the cemetery; and Thomas Honebrink,[5] the cemetery caretaker.[6] The only claim against the Hugenbergs was for negligent supervision of Mikael. After summary judgment was granted in the Hugenbergs' favor, the Fritzes appealed (collectively, "the Fritz appellants").[7]

At the time of the accident, the Hugenbergs had both a homeowner's insurance policy and an auto insurance policy with West American Insurance Company/Ohio Casualty Group (West American). West American filed a separate declaratory judgment action (Case No. 00–CI–02584), seeking a declaration that there was no liability coverage available under either policy for the Hugenbergs or Mikael for the claims raised against them in the underlying personal injury suit. The trial court granted summary judgment in favor of West American. Mikael and the Fritz appellants have separately appealed this summary judgment.[8]

Dauwe had an auto insurance policy with Liberty Mutual Insurance Company (Liberty Mutual) at the time of the accident. Liberty Mutual also filed a separate declaratory judgment action (Case No. 01–CI–00209), seeking a declaration that there was no liability coverage under Dauwe's auto policy for the claims raised against Mikael. Liberty Mutual also sought a declaration that it owed no contractual duty to defend Mikael. Summary judgment was granted in favor of Liberty Mutual. The Hugenbergs have filed an appeal of this summary judgment on their own behalf and on behalf of Mikael (collectively, "the Hugenberg appellants").[9] The Fritz appellants have also separately appealed.[10]

The general issues before the Court in these five appeals are:

1) Whether a genuine issue of material fact exists as to the alleged negligence of the Hugenbergs in supervising their son, Mikael;

2) Whether a genuine issue of material fact exists as to coverage under the Hugenbergs' homeowner's insurance policy with West American;

3) Whether a genuine issue of material fact exists as to coverage under the Hugenbergs' auto insurance policy with West American; and

4) Whether a genuine issue of material fact exists as to coverage under Dauwe's auto insurance policy with Liberty Mutual.

## II. STANDARD OF REVIEW.

■ Summary judgment is proper only if the movant demonstrates "that the ad-

---

5. Mikael's friend Bo Honebrink was the son of the cemetery's caretaker.

6. A number of additional parties were brought into this case; and additional claims were raised as a result of the filing of cross-claims, a counterclaim, and a third-party complaint. These additional parties and claims are not relevant to the summary judgment orders on appeal.

7. This appeal is Case No. 2004–CA–001490–MR.

8. Mikael's appeal is Case No. 2004–CA–001472–MR. The Fritz appellants' appeal is Case No. 2004–CA–001491–MR.

9. The appeal by the Hugenberg appellants is Case No. 2004–CA–002172–MR.

10. The Fritz appellants' appeal is Case No. 2004–CA–002127–MR.

verse party could not prevail under any circumstances."[11] However, "a party opposing a properly supported summary judgment motion cannot defeat that motion without presenting at least some affirmative evidence demonstrating that there is a genuine issue of material fact requiring trial."[12] "In the analysis, the focus should be on what is of record rather than what might be presented at trial."[13] In ruling on a motion for summary judgment, the trial court must view the facts and all inferences reasonably drawn from them in the light most favorable to the party opposing the motion.[14] And, on appeal, we must determine whether the trial court correctly found that there were no genuine issues of material fact and that the moving party was entitled to summary judgment as a matter of law.[15] Because findings of fact are not at issue, we need not defer to the trial court.[16]

### III. ANALYSIS.

**A. There is no Genuine Issue of Material Fact Regarding the Summary Judgment Claim in Favor of the Hugenbergs on the Negligent Supervision Claim.**

The Fritz appellants assert that the trial court erred in granting summary judgment on the negligent supervision claim because there are material questions of fact concerning whether the Hugenbergs were negligent in their supervision of their minor son, Mikael, and whether this negligence contributed to the injuries suffered by Brad. While negligent parental supervision can give rise to a viable cause of action, the Fritz appellants have failed to present any facts that raise a jury question.

**1. The Elements of the Tort of Negligent Supervision.**

The essence of a negligent supervision claim is that the parent's "failure to exercise due care has made it possible and probable that the child would injure another."[17] A negligence action requires proof of: (1) a duty on the part of the defendant; (2) a breach of that duty; and (3) a consequent injury, which consists of actual injury or harm, plus legal causation linking the defendant's breach with the plaintiff's injury.[18] Kentucky's highest court has cited, with approval, the following description of a parent's duty to supervise or control the minor child:

A parent is under a duty to exercise reasonable care so to control his minor child as to prevent it from intentionally harming others or from so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent

(a) knows or has reason to know that he has the ability to control his child, and

(b) knows or should know of the necessity and opportunity for exercising such control.[19]

11. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky.1991).

12. *Hubble v. Johnson*, 841 S.W.2d 169, 171 (Ky.1992).

13. *Welch v. American Publishing Co. of Kentucky*, 3 S.W.3d 724, 730 (Ky.1999).

14. *Steelvest*, 807 S.W.2d at 480; *Smith v. O'Dea*, 939 S.W.2d 353, 356 (Ky.App.1997).

15. *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App.1996).

16. *Id.*

17. *Moore v. Lexington Transit Corp.*, 418 S.W.2d 245, 248 (Ky.1967).

18. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88–89 (Ky.2003).

19. *Moore*, 418 S.W.2d at 248 (quoting Restatement (Second) of Torts § 16 (1965)).

The existence of a parent's duty to control a minor child largely turns on the foreseeability of the child's injurious conduct. For a child's act to be foreseeable, it is not necessary that the child have committed that same act before. A duty to control the child may also arise where the child previously has committed a very similar act and there are circumstances making it foreseeable that the child might later commit the specific act at issue.

In *Moore v. Lexington Transit Corp.*, the Court found that a material question of fact existed regarding a mother's negligence in failing to prevent her eight-year-old child from opening a car door into a moving bus, even though the child allegedly had never opened his door without direction before.[20] But, on multiple occasions, the mother had let the child open the door into the bus lane and exit the car at the dangerous intersection where the accident happened.[21] Also, at the time of the accident, there were children in the crosswalk at the intersection.[22] Under these circumstances, the Court reasoned that the mother might well have foreseen that her young son might anticipate and open the door without her direction in his eagerness to join the other children on the way to school.[23]

Parents are not required to be prescient, however. Thus, in *James v. Wilson*,[24] this Court affirmed a summary judgment in favor of the parents of a high-school student, who shot several classmates, on the claim of negligent supervision because there was no evidence that the son had exhibited any behavior that should have placed his parents on notice that they needed to prevent him from shooting his classmates.[25]

When determining whether a child's injurious conduct was foreseeable, the trial court should consider only those facts that the parents knew, or should have known, about before the incident at issue.[26] This determination must be made considering the facts from the perspective of the parents before the incident with every attempt to eliminate the distorting effects of hindsight.[27]

### 2. The Hugenbergs Owed No Duty to the Fritz Appellants Because Mikael's Actions Were Not Foreseeable.

There is insufficient evidence to raise a material question of fact about whether the Hugenbergs were aware, or should have been aware, of the need to prevent their fifteen-year-old son from drinking and driving under the influence of

20. 418 S.W.2d at 246–247.

21. *Id.* at 247–248.

22. *Id.* at 248.

23. *Id.*

24. 95 S.W.3d 875 (Ky.App.2002).

25. *Id.* at 887–888 (stating that the son's occasional practice of taking out his frustrations by beating a barrel did not indicate any proclivity toward violence against people or likelihood of him shooting his fellow students).

26. *See, e.g., id.* at 887 (discounting as factors to be considered in determining whether the son's school shootings were foreseeable the facts that he had previously stolen a gun from his father to sell at school and had accessed violent and pornographic materials on the internet where there was no evidence that the parents knew, or should have known, of these incidents until after the shootings).

27. *See, e.g., id.* at 887–888 (describing as "reasonable under the circumstances" the son's explanation to his parents that the noises from his room the night before the shootings and the large bundle he was taking to class that day were due to a school project, even though the noises were actually part of his preparations for the shootings, and the bundle contained guns).

alcohol on September 18, 1999. The Fritz appellants do not assert that the Hugenbergs had actual knowledge that Mikael was drinking alcohol or driving, much less both, on the night of the accident. And they offer no evidence showing that Mikael had ever driven under the influence of alcohol before. Nevertheless, the Fritz appellants assert that the accident was foreseeable based on a few previous incidents when Mikael had drunk alcohol or had driven a car.

The Hugenbergs only knew of Mikael drinking on two occasions. Once, possibly as long as eleven months earlier, Mikael and some other teenagers drank beer in the woods behind the cemetery. One of the boys called the Hugenbergs to fetch Mikael because he was acting strangely. The Hugenbergs could tell that Mikael had been drinking but thought his condition was due as much to being extremely cold as to being intoxicated. He was lectured by both parents about drinking before he was of legal age. He was grounded and had his privileges curtailed for a time. He was also warned that if he drank again, his parents would not sign the permission form for him to get his learner's permit when he turned sixteen.

They later learned that Mikael also drank alcohol at a party thrown by a girl whose parents were out of town.[28] When confronted, he admitted that he drank at the party. And he was again punished.

On another occasion, Thomas Honebrink called the Hugenbergs to inform them that Mikael was at a particular girl's house; that he had heard that there were no parents present; and that some of the teens, apparently, planned to drink alcohol. Mikael's father picked him up immediately. He saw no alcohol present, and Mikael had not been drinking. Nevertheless, Mikael was punished by his parents, apparently for being at a house without parental supervision and for not being where he said he was going to be.

The Fritzes have presented some testimony indicating that Mikael drank alcohol on other occasions and that he may have been reckless or out of control when he drank. But they have offered no evidence showing that the Hugenbergs knew, or should have known, of these incidents.

Regarding Mikael's driving, Jack Hugenberg testified that he was not aware until after the accident that Mikael had ever driven a car before. Susan Hugenberg testified that she knew of only one incident when she let Mikael practice driving in the cemetery with her in the passenger seat several weeks before the accident. Some of the appellants have presented some evidence indicating that Mikael may have driven on other occasions; but they have offered no evidence indicating that the Hugenbergs knew, or should have known, about these other incidents.

The Fritz appellants assert that "[a]ny reasonable person or parent should have foreseen that if a child with this drinking problem is allowed to continue to drink and is also allowed to operate a motor vehicle, both in violation of the law, that the two illegal acts would inevitably and eventually combine, causing injury to someone." We disagree. We do not think that the knowledge of one driving lesson with his mother, two isolated incidents of drinking, and one incident of being in an unsupervised house with peers who *may* have intended to drink were sufficient to render Mikael's conduct on the night of September 18, 1999, foreseeable.

---

28. They were called after the fact by the girl's mother. Having learned of the unauthorized party, she was apparently calling all of the parents of the children who attended.

The Fritz appellants have criticized the Hugenbergs' efforts to discipline Mikael for drinking as ineffectual, pointing out other steps they might have taken. But parents are under no duty "to take precautionary disciplinary measures or to regulate their children's behavior on an ongoing basis ... to prevent their children from ever entering into a situation where they might commit a negligent act[,]"[29] unless they know, or should know, of a specific need to prevent their child from committing an injurious act. This is true even when the child's prior conduct has not been perfect.[30] Even if drastic punitive measures might have prevented the automobile accident in this case, this does not mean that the Hugenbergs' failure to impose such measures constitutes negligent supervision. Because Mikael's conduct on the night of the accident was not foreseeable, the Hugenbergs were under no duty to take measures to prevent this conduct.

### 3. The Hugenbergs Owed No Duty to the Fritz Appellants Because Mikael Was Not Under the Hugenbergs' Immediate Control.

We also find that the Fritz appellants have presented no evidence establishing that the Hugenbergs had the actual ability to control Mikael sufficiently to prevent him from drinking alcohol and driving under the influence on the night of the accident. The duty to control one's child and prevent injurious behavior depends, in part, on the actual, physical ability to do so.

In *Moore,* the court held that the mother's actual ability to control her son and prevent him from opening the car door could not be disputed because she was in the vehicle with him.[31] In contrast, this Court found in *James* that the fact that the son was not in the "immediate control of his parents" when he stole the gun and ammunition used in the shootings from a third party, nor when the actual shootings occurred at school, served as an additional reason for upholding the summary judgment dismissing the negligent supervision claim against the parents.[32]

The Fritz appellants try to distinguish *James* on the ground that the shootings happened at school where the parents were required by law to send their son but were not permitted to supervise him. The Hugenbergs were not required by law to permit Mikael to go out and socialize with his friends on a Saturday night. Therefore, the Fritz appellants reason that the fact that Mikael was not in his parents' immediate control when all the relevant acts occurred on the night of the accident is proof of the Hugenbergs' negligent supervision. This argument ignores the fact that part of the negligence claim in *James* was based on the fact that the son was able to steal the gun and ammunition from a third party without his parents noticing. Thus, the Court's decision affirming the summary judgment in favor of the parents on the negligent supervision claim did not turn on the fact that the shootings occurred at school where the parents were unable to supervise their son personally.

It is not negligent supervision *per se* for parents to fail to monitor their

29. *Lott v. Strang,* 312 Ill.App.3d 521, 245 Ill. Dec. 154, 727 N.E.2d 407, 409–410 (2000).

30. *See id.* at 409 (holding that the fact that the minor had had an automobile accident one year earlier did not place the parents on notice that another accident was likely to occur.)

31. 418 S.W.2d at 248.

32. 95 S.W.3d at 887–888.

teenager twenty-four hours a day when the parents are not aware of, and have no reason to be aware of, any particular risk necessitating such intensive monitoring. Parents owe no duty to third parties to supervise or control their minor child to prevent the child from harming others unless the parents know, or should know, of the need and opportunity to exercise such control *and* the parents have the ability to exercise such control. The mere fact that the parents do not have the ability to exercise control is not, in and of itself, proof that the parents violated a duty to control their child to prevent him from harming others.

The Fritz appellants have not presented any evidence to establish either that the Hugenbergs knew, or should have known, of a need to prevent Mikael from drinking and driving and of an opportunity to prevent him from doing so *or* that the Hugenbergs had the actual, physical ability to have prevented Mikael from drinking and driving on the evening of September 18, 1999. Therefore, summary judgment was properly granted on the negligent supervision claim.

## B. There is no Genuine Issue of Material Fact Regarding the Coverage Under the Hugenbergs' Homeowner's Insurance Policy with West American.

Mikael and the Fritz appellants separately have appealed the trial court's summary judgment in favor of West American on the issue of the lack of coverage under the homeowner's policy for Mikael or the Hugenbergs based on "the motor vehicle exclusion" in the policy. The provision states, in relevant part, that the policy's coverage provisions for personal liability and medical payment to others "do not apply to 'bodily injury' . . . [a]rising out of . . . [t]he ownership, maintenance, use, loading or unloading of motor vehicles . . . owned or operated by or rented or loaned to an 'insured.' "

In their briefs, both sets of appellants assert that the motor vehicle exclusion does not apply to the Hugenbergs because the negligent supervision claim against them is not one "arising out of" their use of a motor vehicle. We will address the appeals of this summary judgment separately because there are procedural issues complicating the appeal filed by Mikael.

### 1. Appeal by the Fritz Appellants.

### a. Standards for Interpreting Insurance Contracts.

Interpretation of insurance contracts is generally a matter of law to be decided by the court.[33] As such, it is subject to de novo review on appeal.[34] Under the reasonable expectation doctrine, ambiguous terms in an insurance contract must be interpreted in favor of the insured's reasonable expectations and construed as an average person would construe them.[35] But "[o]nly actual ambiguities, not fanciful ones, will trigger application of the doctrine."[36] Absent ambiguity, terms in an insurance contract are to be construed according to their "plain and ordinary meaning."[37] Insurance polices should be construed according to the parties' mutual understanding at the time

---

**33.** *Stone v. Kentucky Farm Bureau Mutual Insurance Co.,* 34 S.W.3d 809, 810 (Ky.App. 2000).

**34.** *MGA Insurance Co., Inc. v. Glass,* 131 S.W.3d 775, 777 (Ky.App.2004).

**35.** *True v. Raines,* 99 S.W.3d 439, 443 (Ky. 2003).

**36.** *Id.*

**37.** *Nationwide Mutual Insurance Co. v. Nolan,* 10 S.W.3d 129, 131–132 (Ky.1999).

they entered into the contract, with this mutual understanding to be deduced, if at all possible, from the language of the contract itself.[38] Exceptions and exclusions in insurance policies are to be narrowly construed to effectuate insurance coverage.[39] But "[r]easonable conditions, restrictions, and limitations on insurance coverage are not deemed *per se* to be contrary to public policy." [40]

### b. The Motor Vehicle Exclusion is Clear and Unambiguous.

The doctrine of reasonable expectation does not come into play in the instant case because the motor vehicle exclusion in the Hugenbergs' homeowner's policy with West American is clear and unambiguous. It is true that the Hugenbergs did not use or operate a motor vehicle. But the policy does not just deny liability coverage to an insured for any bodily injury arising out of the use of a motor vehicle operated by that same insured. Instead, it denies liability coverage for a bodily injury arising out of the use of a motor vehicle "operated by ... an 'insured.'" Based on the plain meaning of this exclusion, coverage for any and all insureds would be denied where the claim was for bodily injury arising out of the use of a motor vehicle operated by any insured.

### c. "Arising Out of ..." Requires a Causal Connection.

It is undisputed that Mikael used a motor vehicle. It is also clear that he is "an 'insured'" within the meaning of the motor vehicle exclusion. The term "insured" is defined in the policy as follows: "'Insured' means you and residents of your household who are: a. Your relatives; or b. Other persons under the age of 21 and in the care of any person named above." Elsewhere in the definitions section, the policy states as follows: "In this policy 'you' and 'your' refer to the 'named insured' shown in the Declarations and the spouse if a resident of the same household." Both the Hugenbergs are listed as named insureds. It is undisputed that Mikael is their son and that at the time of the accident, he lived in their household and was under the age of 21. Therefore, according to the homeowner's policy, Mikael is an "insured."

The only remaining question is whether the negligent supervision claim against the Hugenbergs is a claim for "'bodily injury' ... [a]rising out of ... [t]he ownership, maintenance, use, loading or unloading of motor vehicles ... owned or operated by or rented or loaned to an 'insured[.]'"

The answer turns largely on the meaning of the phrase "arising out of." This phrase has been construed expansively:

> The words 'arising out of * * * use' in an automobile liability insurance policy, are broad, general and comprehensive terms meaning 'originating from,' or 'having its origin in,' 'growing out of' or 'flowing from'.... All that is required to come within the meaning of the words 'arising out of the * * * use of the automobile' is a causal connection with the accident.[41]

---

38. *Id.*

39. *Eyler v. Nationwide Mutual Fire Insurance Co.*, 824 S.W.2d 855, 859 (Ky.1992).

40. *Snow v. West American Insurance Co.*, 161 S.W.3d 338, 341 (Ky.App.2004).

41. *Insurance Co. of North America v. Royal Indemnity Co.*, 429 F.2d 1014, 1017–1018 (6th Cir.1970). Citations omitted. Asterisks in original. *See also* 43 Am.Jur 2d *Insurance* § 708 (2005) (stating that " '[a]rising out of' the use or occupancy of a motor vehicle requires a causal connection between the injuries and the vehicle.").

Thus, we must determine whether the negligent supervision claim against the Hugenbergs is causally connected with Mikael's automobile accident.

### d. The Negligent Supervision Claim is a Claim "Arising Out of" the Use of a Motor Vehicle by an Insured.

The Hugenberg appellants assert that the negligent supervision claim is not a claim arising out of the use of a motor vehicle because the negligent acts or omissions asserted against them do not necessarily involve the use of a motor vehicle, as would be the case if they were accused of negligently entrusting Mikael with a car, for example. But no cause of action lies for negligence unless the plaintiff has suffered a legally-cognizable injury or damage. The negligent supervision claim against the Hugenbergs is based on the bodily injury suffered by Brad in the motor vehicle accident. If not for Mikael's losing control of the car and injuring his passenger, Brad, there could be no claim for negligent supervision against the Hugenbergs because Brad and the Fritzes would have suffered no injury, an essential element of the tort. The negligent supervision claim is based upon Brad's injuries, and Brad's injuries were caused by Mikael's use of Dauwe's car. This satisfies the causal connection between the use of the motor vehicle and the negligent supervision claim, which is required by the "arising out of" language in the motor vehicle exclusion.

Based on the plain meaning of the clear and unambiguous language of the policy, the claim for negligent supervision is a claim seeking coverage for bodily injury arising out of the use of a motor vehicle. The trial court properly entered summary judgment in favor of West American regarding the homeowner's policy. Therefore, we affirm in that appeal brought by the Fritz appellants.

### 2. Any Claims Regarding Coverage for Mikael Under the Homeowner's Policy Have Been Abandoned, and Any Claims Regarding Coverage for the Hugenbergs are not Properly Before this Court.

With regard to both Mikael and the Hugenbergs, there are procedural problems barring us from considering the merits regarding coverage under the West American homeowner's policy. The notice of appeal lists Mikael as the only appellant, both in the caption and the body. And the only issue presented in that notice of appeal concerns Mikael's coverage under the policy "for his liability arising out of his negligent operation of a non-owned automobile which was involved in an accident on 09/18/99." Moreover, the agreed statement filed by counsel for Mikael and counsel for West American under Kentucky Rules of Civil Procedure (CR) 75.15 and the prehearing statement filed by Mikael also list Mikael as the only appellant, both in the caption and the body. And both refer to the only issues on appeal as whether Mikael was entitled to liability insurance coverage and a defense under the homeowner's policy with West American.

Yet, the brief filed in this appeal listed "Mikael J. Hugenberg, a minor, and Jack and Susan Hugenberg, his parents," as "Appellants." This brief exclusively addresses the issue of liability coverage under the West American homeowner's policy for the Hugenbergs on the claim of negligent supervision and whether they were entitled to a defense against this claim. Nowhere in the brief are the issues of liability coverage for Mikael or a duty to provide a defense for him addressed.

"An appellant's failure to discuss particular errors in his brief is the same as

if no brief at all had been filed on those issues."[42] Because Mikael has failed to raise the issue of the availability of liability coverage and a defense for him and his actions under the homeowner's policy with West American, we deem these issues to be waived or abandoned.[43]

 As for those claims that were raised in the appellant's brief regarding the Hugenbergs' liability coverage under the homeowner's policy for the claim of negligent supervision and their entitlement to a defense, these issues are not properly before the Court. We do not have jurisdiction over the Hugenbergs in this case. This is not a case where the Hugenbergs substantially complied with CR 73.03. They were not identified as appellants anywhere until the brief. And the claims raised in the brief are not remotely the same as those identified in the prehearing statement, notice of appeal, or agreed statement under CR 75.15. Therefore, the issues of the availability of a defense and liability coverage for the Hugenbergs on the negligent supervision claim under the homeowner's policy with West American are, also, not properly before this Court in the appeal by Mikael. For these procedural reasons, we affirm in the appeal filed by Mikael.[44]

**42.** *Milby v. Mears*, 580 S.W.2d 724, 727 (Ky. App.1979).

**43.** *C.f., Grange Mutual Insurance Co. v. Trude*, 151 S.W.3d 803, 815 (Ky.2004).

**44.** We note that the arguments which the Hugenbergs attempted to raise concerning coverage under the homeowner's policy for the negligent supervision claim were substantially the same as those rejected on the merits in the appeal filed by the Fritz appellants.

**45.** In an endorsement to the policy, "[i]nsured" is defined as:

## C. There is no Genuine Issue of Material Fact Regarding Coverage Under the Hugenbergs' Auto Policy with West American.

In the summary judgment in favor of West American, the trial court concluded that Mikael was an insured under the Hugenbergs' automobile policy but was, nevertheless, denied coverage based on the following policy exclusion: "We do not provide Liability Coverage for any 'insured': ... [u]sing a vehicle without a reasonable belief that that 'insured' is entitled to do so" (hereinafter "the entitlement exclusion"). The Fritz appellants assert that there are material questions of fact concerning whether the exclusion applies to Mikael and whether he used Dauwe's vehicle without a reasonable belief that he was entitled to do so.

### 1. The Entitlement Exclusion is not Ambiguous.

 It is clear that Mikael is an "insured" within the terms of the Hugenbergs' auto policy with West American, despite the fact that he had no driver's license or learner's permit.[45] The question is whether he is excluded from coverage, nevertheless, because he used the vehicle without a reasonable belief that he was entitled to do so. Although the Fritz appellants assert that the exclusion is inher-

"The 'named insured' or any 'family member' while: ...
'[o]ccupying' ... any 'motor vehicle.' "
In the same endorsement, "[f]amily member" is defined, in relevant part, as follows:
"the spouse and any person related to the 'named insured' by blood, marriage or adoption ... who is a resident of the 'named insured's' household...."
The Hugenbergs and Annie are all named insureds. Since Mikael was related by blood to the Hugenbergs and Annie and resided in the same household, he was a family member of a named insured and, hence, an insured himself.

ently ambiguous, the Kentucky Supreme Court has held otherwise with regard to a very similar exclusion in *York v. Kentucky Farm Bureau Mutual Insurance Co.*[46] The issue in that case was whether a user of a vehicle had coverage under his father's auto insurance policy for which he was a listed driver covered during his use of "any auto" or whether he was subject to the following exclusion:

> "B. We do not provide Liability Coverage for any person:
>
> . . . .
>
> 4. Using a vehicle without a reasonable belief that a person is entitled to do so."[47]

The Court found "no ambiguity in the non-permissive user exclusion[,]" stating that "[t]he clear and unambiguous words of an insurance contract should be given their plain and ordinary meaning."[48] It held that the plain meaning of the exclusion showed it be "an overarching exception to the policy coverage as a whole," which excluded liability coverage for the driver.[49] However, the court never addressed what it means to use a vehicle without a reasonable belief that a person is entitled to do so. Presumably this issue was not contested because, under the facts of that case, the driver did not have a reasonable belief that he was entitled to use the vehicle under any possible meaning of that phrase.

### 2. The History of Entitlement Exclusion Clauses.

Although the Supreme Court referred to the clause in *York* as a "non-permissive user exclusion," a more useful designation for the type of clause is an "entitlement exclusion."[50] Entitlement exclusion clauses are a later development in the history of insurance than traditional omnibus clauses, also known as "permissive use clauses," which typically provided coverage for any person provided that the actual use of the vehicle was with the permission of the named insured.[51] Because the issue with regard to a permissive use clause was whether the owner of the vehicle gave the user express or implied permission to use the vehicle, "the focus was solely on the actions of the policyholder."[52] Entitlement exclusion clauses gradually came to replace permissive use clauses as part of a trend toward more expansive coverage. Coverage based on the user's reasonable belief of entitlement is broader in scope and more liberal than coverage based on the express or implied permission to operate the vehicle.[53]

An exclusionary provision in an automobile liability insurance policy which provides that no liability coverage is provided for any person using a vehicle without a reasonable belief that that person is entitled to do so differs from the traditional "omnibus" clause which authorizes coverage for a non-owner's permissive use of a vehicle; the exclusionary clause in question is couched in terms of entitlement rather than permission, causing a shift in the inquiry from an objective determination (whether the

---

46. 156 S.W.3d 291 (Ky.2005).

47. *Id.* at 293.

48. *Id.*

49. *Id.*

50. We borrow this term from Darla L. Keen, Note, *The Entitlement Exclusion in the Personal Auto Policy: The Road to Reducing Liti-*

*gation in Permissive Use Cases or a Dead End?* 84 KY.L.J. 349, 350 (1995).

51. *Id.*

52. *Id.*

53. *Id.* at 351.

owner or one in legal possession of the car gave the user permission) to a mixed objective/subjective determination of the user's state of mind—the reasonableness of the user's subjective belief of entitlement.[54]

### 3. The Two–Pronged Test to Analyze an Entitlement Exclusion Has a Subjective Component and an Objective Component.

In *General Accident Fire & Life Assurance Corp. Ltd. v. Perry*,[55] a Maryland court analyzed how entitlement exclusions, similar to the one in the instant case, have been construed and applied by courts of many different jurisdictions. The court concluded that an exclusion barring liability coverage "for any person . . . [u]sing a vehicle without a reasonable belief that that person is entitled to do so" is not ambiguous.[56] Moreover, the court reasoned that the appropriate way to analyze the entitlement exclusion is with a two-pronged test. The first prong looks at whether the driver had a subjective belief that he was entitled to use the car, and the second prong looks at whether this belief was objectively reasonable.[57] As the court explained, "it is clear that coverage is excluded if the driver (a) knew he was not entitled to drive the vehicle, or (b) if he claimed he believed he was entitled to

drive the vehicle, but was without reasonable grounds for such belief or claim."[58]

We find this two-pronged test consistent with the plain meaning of the language of the entitlement exclusion clause in the instant case because "belief" comports with a subjective standard while "reasonable" comports with an objective standard.

### 4. Mikael Did Not Believe that He was Entitled to Use Dauwe's Car.

The best indication of Mikael's subjective belief at the time he took the car came from his testimony.[59]

Q. At the time you took Randy Dauwe's car, . . . did you feel like that was really okay with Randy?

. . . .

A. Yes. I just figured—he wasn't a real strict person, yes, I just figured that he would have just maybe have, you know, said don't do that or don't do that again, but I mean would have understood my reasoning for doing it, not wanting to get caught walking down the street with beer.

. . . .

Q. Did you feel like you were stealing anything when you took Randy's car or did you feel like—

A. No.

---

**54.** 7 AM.JUR.2D *Automobile Insurance* § 242 (2005).

**55.** 75 Md.App. 503, 541 A.2d 1340 (1988).

**56.** *Id.* at 1342, 1347–1349.

**57.** *Id.* at 1348–1350.

**58.** *Id.* at 1349. *See also, Allstate Insurance Co. v. United States Fidelity and Guaranty Co.,* 663 F.Supp. 548, 553 (W.D.Ark.1987) (holding that the phrase " 'using a vehicle without a reasonable belief that the person is entitled to do so' " means that "the trier of fact must

find that the person using the vehicle believed that he was entitled to do so and that such belief was reasonable"); *Omaha Property & Casualty Insurance Co. v. Peterson,* 865 S.W.2d 789, 790 (Mo.Ct.App.1993) (stating that to avoid the application of the entitlement exclusion, "[the driver] not only had to believe that she had a right to drive the car, but her belief had to be rational.").

**59.** Although we do not attempt to weigh the credibility of the evidence, we note that it would have been in Mikael's best interest to assert that he believed that he was entitled to drive Dauwe's car.

Q. Or did you believe it was really okay?

. . . .

A. No. I did not feel like I was stealing anything.

. . . .

Q. At the moment you got into Randy's car, drove it down the street to Ryan Arlinghaus' so that you wouldn't be seen walking down the street with the beer that Randy bought you, did you believe at the time that what you were doing was okay with Randy Dauwe?

A. I knew it was wrong to take the car, but I just assumed that he wouldn't make that big of a deal of it and get that angry about it to where I should be really concerned like how would he react so I figured—I didn't give too much thought to the situation which—in a whole, which, you know—that led up to the whole accident in general, but I would have thought that he wouldn't have cared that much.[60]

In later testimony, Mikael further clarified as follows:

Q. You testified that you knew that evening you didn't—you shouldn't be driving the car? This is on previous depositions.

A. Correct.

Q. Correct? And you also testified that you didn't think Randy would be, quote unquote, "upset" because you knew he didn't want you driving the car, is that correct?

A. Correct.

Q. When you say he wouldn't be upset, do you mean he wouldn't come up and try to start a fight with you or start yelling at you? You just knew he wouldn't be screaming and yelling at you, is that what you mean?

A. I knew it wouldn't be like just a confrontation or like anything involved with, you know, him being mad like, you know, angry or—

Q. Verbally or physically—

A. Correct.

Q. —upset?

A. It would be just on a calmer plane.

Q. But you understood that he did not want you to drive his car, is that correct?

A. Correct.[61]

The appellants make much of the fact that Mikael did not think that he was "stealing" Dauwe's car, but we think this may be a question of semantics. To a layperson, "stealing" may connote an intent permanently to deprive someone of a possession. Mikael intended to return the car. In fact, he did not necessarily intend to tell Dauwe about using the car.[62] Whether or not Mikael considered what he was doing stealing is irrelevant. Nothing Mikael said or did indicates that he thought he was entitled to use the car. Indeed, he testified that he knew at the time he took the car that it was wrong to do so.

The Fritz appellants also point to statements by Gehring in an affidavit to the effect that he believed that Mikael was entitled to use Dauwe's car. If Gehring's belief was based on some indication by Mikael of Mikael's belief in his entitlement

60. Mikael Hugenberg Deposition, 07/16/2002, pp. 259–262.

61. Mikael Hugenberg Deposition, 08/09/2002, pp. 106–107. This deposition is also cap-

tioned as occurring on 08/09/2000, but this earlier date is an error.

62. Mikael Hugenberg Deposition, 08/09/2002.

to use the car, then this might raise a material question of fact. But a closer examination of Gehring's testimony shows that he simply assumed that Mikael was authorized to use the car, based on his own belief that Mikael would not steal and the fact that Mikael had the car keys.[63] Gehring's assumptions do not raise a material question of fact because they do not go to the critical question of Mikael's subjective belief.

The Fritz appellants have also attempted to say that since Mikael's mother let him drive in the cemetery once with her and since he knew that some other unlicensed drivers drove in the cemetery, then he, Mikael, may have reasonably believed that he, too, was entitled to drive in the cemetery. But the question is not whether he believed he was entitled to drive in the cemetery but whether he believed he was entitled to drive Dauwe's car.

The Fritz appellants also point to testimony by Susan Grout that she had seen Mikael driving Dauwe's car on a previous occasion in the street in front of the Hugenbergs' house with Dauwe standing outside watching Mikael. We do not think that evidence that Mikael had used the car on another occasion in Dauwe's presence even raises an inference that Mikael subjectively believed that he was entitled to use the vehicle on this occasion.

Similarly, any evidence suggesting that Dauwe might have given Mikael the keys does not show that Mikael subjectively believed that he was entitled to drive the car.[64] It is clear from the record that at the time he took Dauwe's vehicle, Mikael did *not* believe that he was entitled to use

it. And, based on the evidence presented, no reasonable jury could conclude otherwise.

Because Mikael did not satisfy the first prong of the test, there is no need to continue further. When the driver has made it clear that he did not believe that he was entitled to operate the vehicle under the circumstances just before the accident, "[t]he question of whether or not, if the operator had believed that he was entitled to operate the vehicle, that belief was reasonable, is irrelevant."[65] Where Mikael held no belief in his entitlement to use Dauwe's car, we need not determine the reasonableness of this nonexistent belief. For all these reasons, the trial court properly determined that the entitlement exclusion precluded liability coverage for Mikael under the Hugenbergs' auto policy. The summary judgment in favor of West American was proper.

### D. There is a Material Question of Fact as to Dauwe's Coverage Under the Liberty Mutual Policy.

The Fritz appellants and the Hugenberg appellants have each separately appealed from the summary judgment granted in favor of Liberty Mutual in its declaratory judgment action. The trial court's decision was based on its ruling that there could be no liability coverage for Mikael under Dauwe's auto insurance policy because of an entitlement exclusion. The exclusion in question reads as follows: "We do not provide Liability Coverage for any 'insured:' ... [u]sing a vehicle without a reasonable belief that that 'insured' is entitled to do so."[66] As with the entitle-

---

63. Blake Gehring Affidavit, 07/02/2004.

64. If Mikael had believed that he was entitled to drive the car, any evidence suggesting that Dauwe gave him the car keys would go toward showing the reasonableness of that belief.

65. *Donegal Mutual Insurance Co. v. Eyler,* 360 Pa.Super. 89, 519 A.2d 1005, 1010 (1987).

66. This provision was contained within an endorsement to the policy, but it was also found in the original policy. It was merely designated by a new number and letter. This

ment exclusion in the West American policy, both sets of appellants assert that there are material questions of fact concerning whether Mikael used Dauwe's vehicle without a reasonable belief that he was entitled to do so.

Mikael is clearly an "insured" within the meaning of the Liberty Mutual policy.[67] Because this provision is identical to the one in the Hugenbergs' West American auto insurance policy and the facts are identical, our holding would be the same with regard to coverage under the Liberty Mutual Policy, except for the possible effect of the Motor Vehicle Reparations Act (MVRA).[68]

### 1. The Minimum Liability Coverage Requirements of the MVRA.

█ The question is whether the entitlement exclusion by Liberty Mutual is in derogation of the minimum liability coverage required by the MVRA. The effect of the MVRA was properly before the trial court. The Fritz appellants, in their answer to Liberty Mutual's complaint for declaratory judgment, incorporated "any special or affirmative defense provided for under the Kentucky No–Fault Motor Vehicle Reparations Act, [KRS] 304.39–010 [*et seq.*] and all subsequent amendments and case law interpretations thereof." Also, the Hugenberg appellants raised the issue more plainly, stating that the court had to address whether the policy exclusion relied upon by Liberty Mutual derogates from the minimum liability coverage required by the MVRA and, hence, is void as against the expressed public policy of the MVRA.

By enacting the MVRA, the legislature "intended to create a comprehensive compulsory insurance system that requires owners to provide vehicle security covering basic reparation benefits and that imposes legal liability on vehicle owners for damages or injuries arising out of ownership of or use of the vehicle."[69] KRS 304.39–080 states, in relevant part, as follows:

> [E]very owner of a motor vehicle registered in this Commonwealth or operated in this Commonwealth by him or with his permission shall continuously provide with respect to the motor vehicle while it is either present or registered in this Commonwealth, and any other person may provide with respect to any motor vehicle, by a contract of insurance or by qualifying as a self-insurer, security for the payment of basic reparation benefits in accordance with this subtitle and security for payment of tort liabilities, arising from maintenance or use of the motor vehicle....

This statute creates an affirmative duty for the owner of every vehicle operated in the Commonwealth "by him [the owner] or with his permission" to obtain insurance coverage for basic reparation benefits and the required minimum tort liability coverage. "Owner" is defined within the MVRA as "a person, other than a lienholder or secured party, who owns or has title to a motor vehicle or is entitled to the use and possession of a motor vehicle subject to a security interest held by another person[,]" excluding "a lessee under a lease not intended as security."[70] Under KRS

---

policy, along with several other documents, including Liberty Mutual's motion for summary judgment, was misfiled in Case No. 00–CI–02269 rather than Case No. 01–CI–00209. However, the trial court in Case No. 01–CI–00209 was aware of this misfiling and considered these documents anyway.

**67.** The policy defines "insured" as including "[a]ny person using 'your covered auto.'"

**68.** KRS 304.39, *et seq.*

**69.** *McGrew v. Stone*, 998 S.W.2d 5, 6 (Ky. 1999).

**70.** KRS 304.39–020(12).

304.39–100(1), "[a]n insurance contract which purports to provide coverage for basic reparation benefits or is sold with representation that it provides security covering a motor vehicle has the legal effect of including all coverages required by this subtitle." Thus, auto liability insurance contracts sold in Kentucky cannot cover less than the minimum coverage required by the MVRA.

Based on the evidence in the record, Dauwe was an owner of a motor vehicle within the MVRA. So he had an obligation to obtain insurance coverage for the payment of basic reparation benefits and tort liabilities "arising from maintenance or use of the motor vehicle"[71] for any motor vehicle "operated in this Commonwealth by him *or with his permission*[.]"[72] And, under KRS 304.39–100, Liberty Mutual would not be permitted to offer Dauwe less coverage than the minimum required by the MVRA.

### 2. *York* is Distinguishable from the Instant Case.

■ The MVRA requires Dauwe to provide insurance coverage for basic reparation benefits and tort liabilities arising out of the use of the motor vehicle to anyone operating the motor vehicle "with his [Dauwe's] permission." Yet, the entitlement provision in Dauwe's policy with Liberty Mutual excludes liability coverage "for any 'insured:' . . . . [u]sing a vehicle without a reasonable belief that that 'insured' is entitled to do so." In *York*, the Kentucky Supreme Court held that an insurance company was not required to provide liability coverage for its insured, who was excluded from coverage by his auto insurance policy based on a similar entitlement exclusion.[73] But the insurance company in question was the insurer for the driver of the vehicle, not the owner.[74] And this distinction was crucial to the holding of the case. The Court determined "that the language of KRS 304.39–080(5) regarding liability insurance on non-owned vehicles is merely permissive, as it reads 'any other person may provide' liability insurance."[75] Thus, the exclusion was valid because the driver, who did not own the car, was under no obligation under the MVRA to provide any insurance coverage for anyone using the car. This explains why the MVRA was not relevant to the question of whether there was liability coverage under the Hugenbergs' auto insurance policy.

We also note that *York* was distinguishable from the instant case in another way. In *York*, there was no question over whether the driver had permission to use the vehicle; all the parties acknowledge that he did not.[76] Since the MVRA only requires coverage for a car used with the owner's permission, this also meant that there was no obligation under the MVRA to provide liability coverage. *York* does not address the question of whether the MVRA requires the owner of a car to provide minimum coverage for a driver who used the owner's car without a reasonable belief that he was entitled to do so but with the owner's permission.

### 3. The MVRA and the Entitlement Exclusion Apply Different Standards to Determine Coverage.

■ The difficulty lies in the fact that the entitlement exclusion and the MVRA

71. KRS 304.39–080(5).

72. *Id.* (Emphasis added.)

73. 156 S.W.3d at 294.

74. *Id.* at 292, 293.

75. *Id.* at 294.

76. *Id.* at 293–294.

use different standards. The insurance policy excludes liability coverage for an insured using the car without a reasonable belief that he is entitled to do so while the MVRA mandates that Dauwe and his auto insurer provide minimum coverage, including liability coverage, for anyone using Dauwe's car with Dauwe's permission. Just as one might have a reasonable belief in his entitlement to use a vehicle, even though he has no permission to do so, one might have the owner's permission to use a vehicle but still have no reasonable belief that he is entitled to do so. Thus, we must determine if there is a question of fact regarding whether Dauwe gave Mikael permission to use his car. This question is material because, to the extent that the entitlement clause of Dauwe's insurance contract with Liberty Mutual tried to deny liability coverage for a driver using Dauwe's vehicle with Dauwe's permission, it would be void and unenforceable.

**4. There is a Material Question of Fact Regarding Whether Mikael had Dauwe's Express or Implied Permission to Operate Dauwe's Car.**

■■■ Mikael and Dauwe both testified in depositions to the following points: (1) Mikael had never driven Dauwe's car before the night of the accident; (2) Dauwe had refused Mikael's previous requests to drive; (3) Mikael did not ask to drive Dauwe's car on that night; (4) Dauwe did not tell Mikael that he could drive his car on that night; and (5) Dauwe did not give Mikael his car keys, nor tell him where he left them.

Dauwe testified that he habitually left the car keys in the closed console of his unlocked car. He stated that he did not know that Mikael was aware of his habit of leaving his keys in the car. Mikael, on the other hand, testified that he knew of Dauwe's habit of leaving the keys in his car. Mikael stated that he did not decide to drive until he went with Gehring and Joe Brady to retrieve the beer from the trunk on the way to the Arlinghauses. Mikael said he got the keys from the open console and, then, went to remove the beer from the trunk.[77] Mikael said he decided to drive Dauwe's car only when he saw that the beer was in clear plastic bags. But Gehring testified in his deposition and stated in an affidavit that Mikael already had Dauwe's car keys in his hand and was discussing driving Dauwe's car *before* they ever arrived at the car, meaning that Mikael did not get them from the console when he said that he did. This creates a possible inference that Dauwe gave Mikael the keys to his car, which further suggests that he gave Mikael express or implied permission to drive the car.

This inference is supported by testimony by Susan Grout that she had seen Mikael driving Dauwe's car on an earlier occasion while Dauwe watched. Because the facts must be interpreted in the light most favorable to the nonmoving party, we perceive a question of fact concerning whether Mikael had permission to use Dauwe's car. Based on these facts, we cannot say that it would be impossible for the Fritz appellants or the Hugenberg appellants to prove that Mikael operated Dauwe's vehicle with Dauwe's permission. If they succeeded in establishing this point, the plain language of the MVRA would require Dauwe's insurer to provide liability coverage for Mikael, despite the language of the entitlement clause. So the trial court's grant of summary judgment in favor of Liberty Mutual on the issue of coverage

---

**77.** Mikael did not recall if he used the keys to unlock the trunk or used the trunk release button.

for Mikael under Dauwe's auto insurance policy was premature. We reverse and remand on this point for further proceedings.

## IV. DISPOSITION.

A. Based on the merits, we affirm the underlying summary judgments in the following cases:

1. Case No. 2004–CA–001490–MR; and

2. Case No. 2004–CA–001491–MR;

B. We also affirm in Case No. 2004–CA–001472–MR on procedural grounds because the only issues properly before this Court on appeal were abandoned or waived; and

C. We reverse and remand for further proceedings consistent with this opinion in the following cases:

1. Case No. 2004–CA–002127–MR; and

2. Case No. 2004–CA–002172–MR.

ALL CONCUR.