**WHITE/REACH BRANNON RD., LLC; and K. Stephen Reach, Appellants,**

v.

**RITE AID OF KENTUCKY, INC., Appellee.**

NO. 2013–CA–001899–MR

Court of Appeals of Kentucky.

RENDERED: APRIL 29, 2016; 10:00 A.M.

Brief for Appellants: Richard A. Getty, Mary Ann Getty, Danielle H. Brown, Lexington, Kentucky.

Brief for Appellee: Kevin G. Henry, R. Douglas Martin, Lexington, Kentucky.

BEFORE: CLAYTON, KRAMER, AND STUMBO, JUDGES.

## OPINION

CLAYTON, JUDGE:

White/Reach Brannon Rd., LLC ("White/Reach") and K. Stephen Reach (collectively, the "Appellants") appeal both the October 8, 2013 Jessamine Circuit Court order that granted partial summary judgment to Rite Aid of Kentucky, Inc.

("Rite Aid"), a third-party defendant and now Appellee, and also the October 28, 2013 supplemental judgment granting attorneys' fees, expenses, and court costs of $102,200.36 to Rite Aid. After careful consideration of the record and the legal arguments, we affirm.

## BACKGROUND

This case began as a foreclosure action by Town and Country Bank and Trust against White/Reach and Reach for nonpayment of three loans, personally guaranteed by Reach, that concerned the development of an 8.5–acre tract. On May 21, 2012, White/Reach and Reach filed a third-party complaint in the foreclosure action wherein the Appellants alleged breaches by Rite Aid of the Lease Agreement, dated December 18, 2007, the Amendment to Lease, dated March 16, 2009, and a Purchase Agreement, dated February 25, 2010.

Under the Lease Agreement and the Amended Lease, White/Reach, as landlord, and Rite Aid, as tenant, agreed that White/Reach would lease to Rite Aid a building to be constructed by White/Reach on land it owned in Jessamine County, Kentucky. The property was commonly referred to as 3090 Brannon Road ("Brannon Road property"). White/Reach had purchased the property to construct the building for Rite Aid with the express understanding that it was to be leased by them. The property comprised a 2.37–acre lot on the 8.5–acre development.

The agreements between White/Reach and Rite Aid were part of a long-term business relationship. White/Reach had constructed fifty-four Rite Aid pharmacies since 2005, and over one hundred Rite Aid pharmacies overall throughout the Midwest and Southeast. Typically, the pharmacies were built on property purchased by White/Reach and leased to Rite Aid under long-term leases similar to the Lease Agreement and Amended Lease in this matter.

According to White/Reach, it purchased the Brannon Road property after negotiations with Rite Aid wherein Rite Aid represented that it intended to enter into a lease agreement and then later buy out the lease arrangement. Rite Aid asserted that during the economic crash in late 2008, the parties mutually agreed to delay the construction start date. Accordingly, the original Lease was amended. Pursuant to the Amendment to the Lease, White/Reach was to have begun construction of the building for the Rite Aid by August 28, 2010, and to deliver the completed building by the "outside delivery date" of February 28, 2011. Hence, the amendment gave White/Reach the discretion to build and deliver the store to Rite Aid any time after December 1, 2009, but no later than August 28, 2010, with final delivery of a completed building not later than February 28, 2011. The Lease was so amended on March 16, 2009.

No notice of default, as required under the Lease, was ever given by White/Reach to Rite Aid, even though White/Reach lost its construction financing from a syndicate of banks led by Town and Country Bank. Reach testified that the banks quit funding his project in early 2010 and that this kept White/Reach from being able to complete the building in accordance with the Lease, as amended. At this point, White/Reach claimed to have no funds to construct the building. Hence, Rite Aid proffers that the parties substituted a real estate Purchase Agreement dated February 25, 2010, which constituted a novation of the original agreements.

In the Purchase Agreement, Rite Aid unequivocally agreed to purchase the Brannon Road property, which relieved White/Reach of its contractual obligation

to build anything on the property. When the parties entered into the Purchase Agreement, Rite Aid immediately put $2.46 million in escrow for thirteen months. White/Reach agreed to sell (not lease) the vacant Lot without a building to Rite Aid for $2.46 million, which was more than the fair market value. During this time, the deadline for closing the Purchase Agreement was extended by agreement of the parties several times.

Nonetheless, White/Reach never gave notice it was ready to close or tendered a deed to Rite Aid. On February 25, 2011, Rite Aid informed White/Reach that if the sale did not close immediately, the escrow account would be dissolved. The sale did not happen, and it dissolved the escrow account in mid-March 2011. Moreover, Rite Aid points out that even if the Lease or the Amendment had not been replaced by the Purchase Agreement, the "outside delivery date" of February 28, 2011, found in the amended Lease, passed without any construction. In fact, no building was ever constructed.

Then, in April or May 2011, after Rite Aid had terminated the Purchase Agreement and after all the construction deadlines had passed, White/Reach notified Rite Aid that it wanted to build the Rite Aid store under the abandoned Lease. Surprised by White/Reach's attempt to reinstate the Lease Agreement, Rite Aid delivered formal notice of default of the Lease on May 13, 2011, as authorized by Section 8(g), (i), and (j) of the Lease, as amended, for failure to meet the construction deadlines. White/Reach had sixty days to correct the defaults but during the sixty-day period, it did not begin construction on the Rite Aid store. On July 12, 2011, Rite Aid wrote White/Reach and declared the Lease to be finally terminated without any possible cure.

Returning to White/Reach's third-party complaint, when White/Reach filed the complaint, it maintained that despite the Lease Agreement and Amended Lease, Rite Aid prevented White/Reach from the construction of the pharmacy on the Brannon Road property, and this delay caused significant damages to White/Reach. According to White/Reach, because Rite Aid did not approve the construction of the pharmacy the initial plans commissioned by White/Reach expired and caused their damages. Therefore, White/Reach averred in the Complaint that Rite Aid was responsible for delay of damages under the original Lease, breached the build-to-suit lease, breached the real estate contract, and breached the implied duty of good faith and fair dealing. Further, it requested indemnity and contribution as to White/Reach and Reach.

Concerning delay damages, Rite Aid responded that it had no obligations under the Lease until the store was actually built and no control over the start of construction. Rite Aid pointed out that in the Amendments to the Lease, both parties agreed to extend the construction deadlines for White/Reach and to increase the amount of rent paid by Rite Aid once White/Reach completed the store. Also, Reach testified repeatedly that the banks ceased funding the project in early 2010. Finally, when it entered into the Purchase Agreement, it agreed to purchase the Lot to relieve White/Reach from the duty and expense of constructing the building.

Hence, White/Reach has no basis for claiming delay damages since the alleged delays were agreed to in the Lease Amendments and Purchase Agreement. Rite Aid also countered the allegations in the Complaint by noting that no notice of breach or default was ever given by White/Reach. Therefore, Rite Aid adamantly claims there is no basis for the Appellants'

delay of damages claim or breach of the lease claim since it fully complied with all the duties and obligations under the Lease and Purchase Agreement.

Moreover, Rite Aid argued that since White/Reach never constructed the building, Rite Aid had no contractual duty to pay rent. And, significantly, Rite Aid posited that White/Reach committed the first and only breach of the Lease by not constructing the building. This breach relieved Rite Aid from all further performance. Rite Aid also observed that during the time White/Reach was obligated in good faith to seek a release of the Town and Country Bank's mortgage on the property, it never advised the Bank of the existence of the parties' binding real estate purchase agreement with its escrow account.

On June 7, 2013, Rite Aid filed a motion for summary judgment including a request for attorneys' fees. It asserted that the Lease Agreement and Amended Lease had been replaced by the later-executed Purchase Agreement. White/Reach countered that the Purchase Agreement was an executory accord, and therefore, did not act as a novation of the original lease.

On October 8, 2013, the trial court granted partial summary judgment and dismissed the complaint against Rite Aid in its entirety. The trial court's dismissal of the third-party complaint was supported by the contracts themselves, admission of Stephen Reach, and other undisputed evidence. The order was made final and appealable by its terms.

Next, on October 28, 2013, the trial court entered a supplemental judgment awarding Rite Aid its attorneys' fees. This judgment was also final and appealable. White/Reach appealed the decisions. The appeal was held in abeyance during the pendency of White/Reach's Chapter 11 bankruptcy proceedings. The dispute with the Bank was resolved, but White/Reach and Rite Aid were unable to settle their differences during the bankruptcy proceedings. Consequently, the matter was returned to the Court of Appeals' active docket.

## STANDARD OF REVIEW

The standard of review on appeal of a summary judgment is whether the trial judge correctly found that there were no issues as to any material fact and that the moving party was entitled to a judgment as a matter of law. *Pearson ex rel. Trent v. National Feeding Systems, Inc.,* 90 S.W.3d 46, 49 (Ky. 2002). Further, summary judgment is only proper when "it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476, 480 (Ky. 1991). In ruling on a motion for summary judgment, the Court is required to construe the record in a light most favorable to the party opposing the motion. *Id.* And a party opposing a summary judgment motion "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* at 481.

Further, the proper interpretation of insurance contracts is a matter of law to be decided by a court; and, thus, an appellate court uses a *de novo,* not a deferential, standard of review. *Hugenberg v. West American Ins. Co./Ohio Cas. Group,* 249 S.W.3d 174, 185 (Ky.App. 2006). Similarly, when an appellate court reviews a trial court's decision to grant summary judgment as in this case, the appellate court must determine whether the trial court correctly found that there were no genuine issues of material fact. Kentucky Rules of Civil Procedure (CR) 56.03. Since "sum-

mary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo.*" *Lewis v. B & R Corporation,* 56 S.W.3d 432, 436 (Ky.App. 2001).

With these standards in mind, we turn to the issues in the case.

### ANALYSIS

Numerous arguments are proffered by the parties on appeal. The Appellants argue that the trial court committed reversible error in granting the partial summary judgment. It contends that the Purchase Agreement was not a novation of the Lease but an executory agreement existing alongside the Lease. In making the argument, the Appellants state that regarding the Purchase Agreement, Rite Aid failed to demonstrate express or implied intent for the novation; failed to demonstrate that the documents cover the same matter and scope; and, failed to show that the express terms of the contract cannot exist together.

In addition, the Appellants assert that White/Reach could have constructed the building; that Rite Aid did not establish that White/Reach acted improperly by not advising the Bank of the escrow account; that no promissory estoppel existed; and finally, that issues of material fact existed as to indemnity and contribution claims. Finally, White/Reach and Reach insist that the trial court committed reversible error by awarding Rite Aid attorneys' fees and costs in the supplemental judgment.

Rite Aid defends these assertions by attesting that the Purchase Agreement was a novation and substituted contract for the Lease and Amended Lease; that Rite Aid properly terminated the Purchase Agreement and escrow deposit after White/Reach failed to deliver clear title to the Brannon Road Property; that Rite Aid properly terminated the Lease even if there was not a novation or substituted contract; that White/Reach is estopped from denying the Purchase Agreement superseded the terms of the Lease; that White/Reach's lack of financing prevented it from building the facility; that White/Reach's unclean hands and breach of implied duties of good faith and unfair dealing barred its recovery; that White/Reach's consent is a complete bar to claims of construction delays and breach of the implied covenant of good faith and fair dealing; that White/Reach is not entitled to recover against Rite Aid on theories of indemnity and contribution; and finally, that the economic loss rule limits White/Reach's recovery of contractual remedies.

*Novation*

▉ Rite Aid argues that the Purchase Agreement signed on February 25, 2010, was a novation and substituted contract, replacing the Lease Agreement under Kentucky contract law. When the Purchase Agreement was signed, all obligations under the prior Lease were replaced by the parties' obligations under the Purchase Agreement. White/Reach answers that the Purchase Agreement was an executory accord, and therefore, not a novation of the original lease agreement.

▉ As explained in *Combs,* a novation is the entering into a new contract which takes the place of the original one and in which it is merged and extinguished. If the new contract in express terms rescinds the old one, no question can be asked; yet the same result follows, as a necessary implication, and takes place by operation of law, without any express agreement to that effect, whenever the new contract is manifestly in place of or inconsistent with a former one, or which renders a former contract impossible of

performance. *Combs v. Morgan*, 307 Ky. 711, 717, 211 S.W.2d 821, 825 (1948) (citation omitted). Further, a contract novation relieves parties of the obligations under the contract and results in a new agreement. *Wells Fargo Financial Kentucky, Inc. v. Thomer*, 315 S.W.3d 335, 339 (Ky.App.2010).

▮ Whereas an accord is "a method of discharging a claim whereby the parties agree to give and accept something other than that which is due in settlement of the claim and to perform the agreement." *Bruestle v. S & M Motors, Inc.*, 914 S.W.2d 353, 354 n. 1 (Ky.App.1996) (citations omitted). If the subsequent contract is an executory accord (or an accord without satisfaction) then a breach of that contract will allow the non-breaching party to sue either on the accord or on the original obligation. *Brown v. Noland Company, Inc.*, 403 S.W.2d 33, 35 (Ky.App.1966). Thus, under the Appellants' reasoning, the Purchase Agreement was an executory accord, that is, to be performed if the Lease as amended was not discharged.

Negating the Appellants' suggestion that the Purchase Agreement was an executory accord is language in Paragraph 18 of the Purchase Agreement that specifically states:

> This Agreement and all of the exhibits attached hereto and incorporated herein by this reference supersede all previous agreements or discussions between the parties concerning the sale of the Property, constitutes an integrated and complete state of the Agreement, and may only be amended by a written amendment executed by both parties.

When the Purchase Agreement was signed, Rite Aid put $2.46 million in escrow, and it remained there for thirteen months. The written agreement, acknowledged by both parties and the actions by Rite Aid, demonstrate that the Lease and Amended Lease were superseded or modified by novation or subsequent contract wherein the obligations under the prior Lease were discharged and the new obligations were substituted.

The Appellants argue that they would not have entered into the Purchase Agreement had Rite Aid not insisted. Further, White/Reach alleges that actions by Rite Aid prevented them from performing under the Lease, and because Rite Aid prevented White/Reach from reaching the terms of the Lease, it proposed a Purchase Agreement. However, other than self-serving statements by Reach, no evidence was provided that Rite Aid prevented the construction of the facility. Keeping in mind *Steelvest's* instruction that a party opposing a summary judgment motion "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment,'" the testimony by Reach is insufficient to establish this fact. *Steelvest*, 807 S.W.2d at 481.

Indeed, the impediment to the construction of the building appears to be White/Reach's lack of financing for the project. Moreover, Rite Aid, under the Lease and the Amended Lease, had no contractual obligations to White/Reach until the building was constructed.

White/Reach's claim is also belied by their actions—entering into the Purchase Agreement. As noted in the aforementioned language in Paragraph 18 of the Purchase Agreement, when it was signed, all obligations under the prior Lease were replaced by the parties' new obligations under the Purchase Agreement. The language unambiguously references the new obligation of both parties. Therefore, contrary to the Appellants' assertions that

intent did not exist, the language itself established mutual intent to establish a novation.

Regarding whether the parties intended to enter into a new contract with the signing of the Purchase Agreement, the best evidence of what parties to a contract intended is what they do or stop doing after the contract is signed. First, White/Reach was unable to perform its material obligations under the Lease because it lacked construction financing to build the new store. Second, White/Reach made no effort to construct the building during the thirteen months after Rite Aid placed $2.46 million in escrow. Rite Aid, on the other hand, fulfilled its contractual duties under the Purchase Agreement when it deposited the full purchase amount into escrow. These facts demonstrate that White/Reach believed it was no longer obligated to build the store and that Rite Aid was willing to purchase the land without a building. Therefore, the proposition that the Purchase Agreement was a novation to the Lease is supported by the parties' actions.

 A Court ascertains when parties enter into a new written contract, which addresses the same subject matter, and the terms are clear and unambiguous, as a question of law. 58 Am.Jur.2d *Novation* § 22 (2016). Further, under Kentucky law, a written contract complete in itself will be conclusively presumed to supersede a prior one related to the same subject matter. *Menefee v. Rankins*, 158 Ky. 78, 164 S.W. 365, 367 (1914). Here, the Purchase Agreement, concerning the same property as the Lease, mandated that Rite Aid purchase the property without any building. Consequently, the new agreement concerns the same property but is completely inconsistent with leasing, and no building is on the property. Therefore, the Purchase Agreement supersedes the Lease, as amended. Moreover, the intent of the parties to enter into a novation may be inferred when the new contract renders the former contract impossible to perform. *Combs*, 211 S.W.2d at 825.

White/Reach suggests that Rite Aid reneged on its Purchase Agreement when it removed the money from escrow on March 15, 2011, more than a year after it originally funded the escrow. But White/Reach failed to perform its obligation under the Purchase Agreement since it never delivered clear title by Warranty Deed to Rite Aid as required under the Purchase Agreement. Thus, the sale for $2.46 million never occurred. And Rite Aid gave White/Reach ample time to meet its contractual obligation. The record indicates that Rite Aid granted an amendment to the escrow on May 12, 2010, to allow White/Reach until June 18, 2010, to obtain a mortgage release from Town & Country Bank.

Meanwhile, Rite Aid was unaware that the Bank had agreed to release the mortgage to White/Reach for $2.2 to $2.3 million in early 2010. In fact, during the thirteen months that the funds were in escrow, White/Reach never informed the Bank of the amount of the offer nor the amount in escrow. *The Bank only learned about the amount of Rite Aid's offer in June 2011, well after the June 2010 closing date in the Purchase Agreement.* Significantly, the Appellants do not argue the Bank knew it before then.

White/Reach cannot have it both ways. It cannot argue that Rite Aid breached the Purchase Agreement because the Bank would have accepted it on June 16, 2011, when it failed to inform the Bank the amount of the escrow during the thirteen months it existed. By the time the Appellants informed the Bank, Rite Aid had terminated the Lease, the Purchase Agreement and the escrow account. In-

deed, it was almost sixteen months after the parties entered into the Purchase Agreement on February 25, 2010.

Sometime in April or May 2011, after Rite Aid terminated the Purchase Agreement and after all construction deadlines under the Lease Agreement had passed, White/Reach notified Rite Aid that it wanted to build the store under the abandoned Lease. Rite Aid was surprised and responded by delivering formal notice of default of the Lease on May 13, 2011, as required under Sections 8(g), (i), and (j) of the Lease, as amended, for failure to meet the original construction deadlines. Under the Lease, as amended, White/Reach had sixty days to cure its default. White/Reach never began construction during the sixty-day cure period, and indeed, has never constructed a building on the site.

Therefore, even if the Purchase Agreement was not a novation, the Appellants breached the Lease Agreement and its Amendments. According to Section 8(j) of the Lease, as amended, White/Reach was required to begin construction of the building by the start date of August 28, 2010, and deliver the completed building to Rite Aid by the "outside delivery date" of February 28, 2011. White/Reach never started nor completed the construction of the building. Thus, under the Lease, as amended, Section 3(a), Rite Aid never became liable to pay rent.

In sum, White/Reach and Reach never established that Rite Aid breached any specific provision of any written contract. Moreover, Rite Aid did establish that White Reach failed to give notice of nonperformance as required under Section 25(a) of the Lease; White/Reach did not timely inform the Bank of Rite Aid's offer or its amount to purchase the Lot; and, White/Reach never constructed a building on the Lot before or after the final opportunity to cure. These factors are fatal to

the Appellants' third-party complaint, and the trial court properly dismissed it.

*Promissory Estoppel*

■ White/Reach maintains that the Purchase Agreement was an executory accord, and consequently, it was entitled to seek recovery under the Lease. Thus, the trial court's acceptance that based on promissory estoppel, White/Reach was estopped from denying the Purchase Agreement superseded the Lease was in error. We disagree.

■ Promissory estoppel requires "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance [and it] is binding if injustice can be avoided only by enforcement of the promise." *Sawyer v. Mills,* 295 S.W.3d 79, 89 (Ky.2009).

When the parties entered into the Purchase Agreement, Rite Aid reasonably expected that by paying $2.46 million into escrow, it would no longer be obligated to pay rent under the rescinded Lease, particularly since no building had been constructed. Rite Aid suffered detrimental reliance through the loss of the use of the escrow funds for more than a year. White/Reach cannot claim damages under the Lease for a building that was never constructed, particularly for an injury that was self-created. It never informed the Bank that it had agreed in early 2010 to release the Lot for $2.2 to $2.3 million.

*Indemnity or Contribution*

■ White/Reach has used the terms "indemnity" and "contribution" without providing any basis in law or fact to support a viable claim against Rite Aid under either theory. These issues are properly dismissed under the partial summary judgment. In addition, White/Reach has no basis for seeking tort damages to supple-

ment the various written agreements with Rite Aid. The economic loss rule in Kentucky limits any recovery by White/Reach solely to contractual remedies that the parties negotiated and bargained for in their express written agreements. *Giddings & Lewis, Inc. v. Industrial Risk Insurers,* 348 S.W.3d 729, 733 (Ky.2011). Nonetheless, since Rite Aid never breached any contract with White/Reach, it owes no damages.

### Attorneys' Fees

The Appellants contend that the trial court erred in granting attorneys' fees and costs to Rite Aid in the supplemental judgment. They based this claim on the premise that the partial summary judgment was in error. We have upheld the summary judgment, and thus, the award of attorneys' fees and costs is proper under the contractual agreement between the parties. *See* Section 21 of the Purchase Agreement.

### CONCLUSION

Our review of the record, which includes Stephen Reach's testimony, the express terms of the parties' written agreements, and consideration of the requirements of the Statute of Frauds,[1] demonstrate that the grant of partial summary judgment and the supplemental judgment for attorneys' fees and costs was proper, and hence, we affirm the decisions of the Jessamine Circuit Court.

ALL CONCUR.