NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0150n.06

Case No. 17-5963

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Mar 22, 2018
DEBORAH S. HUNT, Clerk

GGNSC LOUISVILLE ST. MATTHEWS LLC, dba Golden Living Center - St. Matthews; GGNSC ADMINISTRATIVE SERVICES, LLC; GGNSC HOLDINGS, LLC; GGNSC EQUITY HOLDINGS, LLC; GGNSC EQUITY HOLDINGS II, LLC; GOLDEN GATE NATIONAL SENIOR CARE, LLC; GOLDEN GATE ANCILLARY, LLC; GGNSC CLINICAL SERVICES, LLC; GPH LOUISVILLE ST. MATTHEWS, LLC )
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

      Petitioners-Appellants, )
)

v. )
)

WALLACE BADGETT, as Administrator of the Estate of Joseph Badgett, Deceased, )
)
)

      Respondent-Appellee. )

---

**Before: MERRITT, CLAY, and SUTTON, Circuit Judges**

    **MERRITT, Circuit Judge.** The district court phrased this issue of first impression exactly as we would: "When a patient signs an arbitration agreement at one nursing home, but later disclaims an identical agreement at a facility owned by the same parent company, may the first agreement be enforced?" *GGNSC Louisville St. Matthews, LLC v. Badgett*, No. 3:17-CV-00188-TBR, 2017 WL 3097534, at \*3 (W.D. Ky. July 20, 2017). Because the second arbitration agreement here constituted a novation of the first agreement and clearly expressed the intent of

the parties, we hold that no valid agreement to arbitrate exists and **AFFIRM** the judgment of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Joseph Badgett was admitted to Golden LivingCenter ("GLC") Mt. Holly, a nursing home in Louisville, Kentucky owned by Golden Gate National Senior Care ("GGNSC"), LLC and its related entities, in June 2013. He signed an admissions agreement and an optional Alternative Dispute Resolution Agreement ("Mt. Holly arbitration agreement") as part of his paperwork. The Mt. Holly arbitration agreement stated that it "is entered into by GLC – Mt. Holly, ('Facility'), and Joseph Badgett." "Facility" is defined as "the living center, its employees, agents, officers, directors, affiliates and any parent or subsidiary of Facility." It goes on to say that "[i]t is the intent of the Parties that this Agreement shall inure to the benefit of, bind, and survive them, their successors, and assigns." Unless the agreement is revoked in writing within 30 days, the agreement "shall remain in effect for all care and services rendered to the Resident at or by the Facility regardless of whether the Resident is subsequently discharged and readmitted to the Facility without renewing, ratifying, or acknowledging this Agreement."

The Mt. Holly arbitration agreement required any "Covered Disputes" between the parties to be resolved by mediation or arbitration. "Covered Disputes" include "any and all disputes arising out of or in any way relating to this Agreement or to the Resident's stay at the Facility or the Admissions Agreement between the Parties." Upon execution, the agreement "becomes part of the Admission Agreement" and is "governed by the Federal Arbitration Act." Badgett and a GLC Mt. Holly representative both agreed to arbitration and signed on the last page. Badgett did not revoke the agreement.

It is unclear how long Badgett resided at GLC Mt. Holly; however, he was admitted to the hospital by January 2015. He also lived at his home and a non-GGNSC nursing home at times. In September 2015, he was admitted to GLC St. Matthews, another GGNSC facility, where he remained until he died on February 16, 2016.

Upon admission to GLC St. Matthews, Badgett executed two documents, an admissions agreement and another Alternative Dispute Resolution Agreement ("St. Matthews arbitration agreement"). The first document, an admissions agreement, contained the following provision:

**XI.  Entire Agreement**
This Agreement and the Notices given to you upon admission constitute the entire Agreement between you and us for the purposes of your admission to our LivingCenter.    There are no other agreements, understandings, restrictions, warranties or representations between you and us as a condition of your admission to our LivingCenter.  This Agreement supersedes any prior admission contracts regarding your admission to our LivingCenter.  However, if you execute, or have executed, an Alternative Dispute Resolution Agreement with us in connection with any admission to our LivingCenters, then that Agreement shall be, and remain, binding upon you, and upon us, in accordance with the terms that are set forth in that Agreement.

The second document, the St. Matthews arbitration agreement, was identical to the Mt. Holly agreement, except that "GLC, St. Matthews" is substituted as the "Facility" and on the last page it offered the resident a choice of whether to accept or decline arbitration.  Badgett signed below the line stating, "The Alternative Dispute Resolution Agreement above set forth is hereby DECLINED."

After Badgett's death, Wallace Badgett, as administrator of Badgett's estate, brought a negligence and wrongful death action in Kentucky state court against several GGNSC-related entities, nursing home administrators, and John Doe defendants.  GGNSC then filed an action in federal district court seeking to compel arbitration of the state court action, to stay the state court action pending arbitration proceedings, and to enjoin the estate from further pursuing its claims in state court.  In support, GGNSC relied upon the Mt. Holly arbitration agreement that Badgett signed in June 2013 and contended that it remained binding.  In response, the estate moved to dismiss the action, arguing that the Mt. Holly agreement did not require the estate to arbitrate claims arising from Badgett's stay at St. Matthews and that the St. Matthews admissions documents applied.

The district court held that the St. Matthews arbitration agreement constituted a novation of the prior contract and found that no valid arbitration agreement existed between the parties. Accordingly, it denied GGNSC's motion to compel arbitration and granted the estate's motion to dismiss.  GGNSC appeals.

## II. ANALYSIS

We review de novo a district court's decision on whether to compel arbitration pursuant to the Federal Arbitration Act. *Burden v. Check Into Cash of Ky., LLC*, 267 F.3d 483, 487 (6th Cir. 2001). GGNSC argues on appeal that the district court erred when it failed to (1) apply the liberal federal policy favoring arbitration, (2) hold the estate to its heavy burden in establishing that the first arbitration agreement was revoked, (3) enforce the unambiguous agreement according to its terms, (4) resolve any doubts in favor of arbitration even if the agreement was ambiguous, and (5) recognize that the elements of a novation were not met.

### A. The Federal Arbitration Act

The Federal Arbitration Act ("the Act") makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is a "liberal federal policy favoring arbitration" and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). "[C]ourts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted). Because arbitration agreements are fundamentally contracts, we review the enforceability of an arbitration agreement according to the applicable state law of contract formation. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

GGNSC correctly argues that the law favors arbitration agreements. Notwithstanding this, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). Therefore, we must apply Kentucky law to determine whether the Mt. Holly arbitration agreement is enforceable.

### B. Kentucky Contract Law Determines Which Contract Governs

"The court must determine whether the dispute is arbitrable, meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement." *Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F.3d 997, 1001 (6th Cir. 2009) (internal quotation marks omitted). "Moreover, '[i]n the absence of any

express provision excluding a particular grievance from arbitration . . . *only the most forceful evidence* of a purpose to exclude the claim from arbitration can prevail.'" *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 503 (6th Cir. 2007) (emphasis added) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).

It is undisputed that the Mt. Holly arbitration agreement was entered into by the parties and broadly covers any disputes that arise. Therefore, GGNSC is correct that because a valid agreement exists, Badgett has a heavy burden of rebutting this agreement. GGNSC argues that because the Mt. Holly arbitration agreement is unambiguous, it should be enforced according to its terms. While it is a fundamental principle of Kentucky contract law that unambiguous agreements should be strictly enforced, *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016), this argument fails to consider the existence of the St. Matthews arbitration agreement. The question we must first answer is which arbitration agreement applies.

In *Veech v. Deposit Bank of Shelbyville*, the Court of Appeals of Kentucky, then the state's highest court, stated that, "[d]ifferent instruments relating to and constituting a part of the same transaction may be interpreted together in determining the intention of the parties." 128 S.W.2d 907, 913 (1939). The Restatement agrees that "[a] writing is interpreted as a whole, and all writings that are part of the *same transaction* are interpreted together." Restatement (Second) of Contracts § 202(2) (1981) (emphasis added).

The St. Matthews admissions agreement "supersedes any prior admissions contracts regarding your admission to our LivingCenter." Therefore, the Mt. Holly admissions agreement is not at issue. The St. Matthews admissions agreement goes on to state that, "if you execute, or have executed, an Alternative Dispute Resolution Agreement with us in connection with any admission to our LivingCenters, then that Agreement shall be, and remain, binding upon you, and upon us, in accordance with the terms that are set forth in that Agreement." Thus, because Badgett previously agreed to arbitration at Mt. Holly, another GGNSC facility, that election would seemingly remain binding in perpetuity, even though he was later admitted to a different GGNSC facility. Our analysis would end here if not for the existence of the St. Matthews arbitration agreement.

GGNSC presented Badgett with an arbitration agreement that was identical to the Mt. Holly arbitration agreement upon his admissions to St. Matthews. However, the St. Matthews arbitration agreement contains two signature lines—one for the resident to accept arbitration, and one to decline it. Therefore, it offers the resident a choice of whether to submit to arbitration or not, and Badgett signed below the signature line declining arbitration. A representative from GGNSC also signed. The St. Matthews arbitration agreement became part of the admissions agreement upon execution.

The St. Matthews admissions agreement supersedes the Mt. Holly admissions agreement, but incorporates both arbitration agreements and allows them both to remain binding. The arbitration agreements are thus a part of the same transaction, and we find that the parties intended to incorporate both arbitration agreements into the contract as a whole. We consider both along with the St. Matthews admissions agreement. The St. Matthews admissions agreement effectively says that if a resident agreed to arbitrate in the past, he must also arbitrate in the future. Contrary to this, the St. Matthews arbitration agreement offers the resident a choice of whether to arbitrate or not. We agree with the district court that these readings are inconsistent when read together. The district court did not decide whether this conflict amounted to an ambiguity because it found a "simpler route." It concluded that "[e]ven if the GLC Mt. Holly arbitration agreement was effective to bind Badgett to arbitrate in perpetuity, the GLC St. Matthews arbitration agreement constitutes a novation of the prior contract." *GGNSC Louisville St. Matthews, LLC*, 2017 WL 3097534, at *4.

## C. Whether a Novation Is Effectuated

We now consider whether a novation occurred. "[A] novation is the entering into a new contract which takes the place of the original one and in which it is merged and extinguished." *White/Reach Brannon RD., LLC v. Rite Aid of Ky., Inc.*, 488 S.W.3d 631, 636 (Ky. Ct. App. 2016). If the new contract's terms expressly rescind the old one, it is an express novation. *Combs v. Morgan*, 211 S.W.2d 821, 825 (Ky. 1948). An implied novation takes place "whenever the new contract is manifestly in place of or inconsistent with a former one, or which renders a former contract impossible of performance." *Id.* (internal quotations and citation

omitted). A "novation relieves parties of the obligations thereunder and results in a new agreement." *Wells Fargo Fin. Ky., Inc. v. Thomer*, 315 S.W.3d 335, 339 (Ky. Ct. App. 2010).[1]

The elements of a novation are "(1) parties; (2) a meeting of the minds; and (3) a consideration." *Daviess Cty. Bank & Tr. Co. v. Wright*, 110 S.W. 361, 363 (Ky. 1908). "[I]ntent is the controlling element . . . and unless the transaction was intended to extinguish the old obligation by substituting the new one therefor, a novation is not effected." *Clark v. Thompson*, 219 S.W.2d 22, 28 (Ky. 1948) (quoting *N. W. Mut. Life Ins. Co. v. Eddleman*, 56 S.W.2d 561, 562 (Ky. 1932)). "[T]he intent of the parties to enter into a novation may be inferred when the new contract renders the former contract impossible to perform." *White/Reach Brannon RD., LLC*, 488 S.W.3d at 638. The burden of proving novation is on the party asserting it. *Kirby v. Scroggins*, 246 S.W.2d 453, 455 (Ky. 1952).

The issue before us is whether the St. Matthews arbitration agreement constitutes a novation of the Mt. Holly arbitration agreement. As the district court recognized, novation typically occurs in the context of a mortgage and is used to alter the parties to the contract or to effect a material change in the parties' bargain. Despite this, there is no rule that novation cannot apply in these circumstances if the elements are satisfied.

Both parties signed the agreements. Badgett's intent is evident. He agreed to arbitrate when GGNSC presented him with an optional arbitration agreement at Mt. Holly. However, when presented with an identical arbitration agreement at St. Matthews two years later, he signed below the line stating, "The Alternative Dispute Resolution Agreement above set forth is hereby DECLINED." Thus, when presented with the same choice upon his admission to another GGNSC facility, he rejected arbitration and wished to have access to the courts should any dispute arise.

Turning to GGNSC's intent, it too agreed to arbitrate in the Mt. Holly arbitration agreement. That election remained binding on both parties up until GGNSC presented Badgett with the St. Matthews arbitration agreement. However, by presenting Badgett with the second arbitration agreement upon his admission to St. Matthews, GGNSC offered Badgett the same choice it offered him at Mt. Holly of whether to arbitrate or not. The agreement contained two

---

[1] *Cf.* Restatement (Second) of Contracts §§ 279, 280 (1981) (addressing discharge by means of substituted contracts and substituted parties).

signature lines, one where the resident could accept arbitration and one where he could decline it. GGNSC could have easily refrained from presenting Badgett with a second arbitration agreement if it intended the first agreement to remain binding. By offering Badgett a choice, GGNSC indicated its intent to extinguish the first agreement by substituting it with a new agreement.

We are unpersuaded by GGNSC's assertion that the offering of the second arbitration agreement meant nothing because the first agreement remained binding forever. This construction would be contrary to the fundamental rule that a written agreement should "be construed as a whole, giving effect to all parts and every word in it if possible." *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986). The proper interpretation of GGNSC's objective intent is that it again offered Badgett the choice of whether to submit to arbitration. Badgett elected to litigate any disputes by signing below the line declining arbitration. *See Messick v. Powell*, 236 S.W.2d 897, 899–900 (Ky. 1951) ("[W]here a party makes an offer and another acts upon it, the party making the offer is bound to perform his promise."); *Gen. Steel Corp. v. Collins*, 196 S.W.3d 18, 21 (Ky. Ct. App. 2006) (holding that buyer's obliteration of arbitration provision in contract offer eliminated the provision from the agreement).

GGNSC also argues that no new arbitration agreement was formed because no new obligation replaced any existing obligation and there was no consideration exchanged. In the second arbitration agreement, both parties substituted their prior obligation to arbitrate disputes with a new agreement that allowed them to litigate disputes. Each party relinquished their right to arbitrate by entering into a new agreement wholly inconsistent with the original agreement. Also, it is well-established that valuable consideration does not need to be money or things of pecuniary value, but "may [be] the doing of something without legal obligation so to do, or refraining from doing something that might be legally done; or anything of benefit to one or of detriment, loss, or inconvenience to the other." *Dorman v. Carnes*, 96 S.W.2d 869, 875 (Ky. 1936). Here, the parties entered into the Mt. Holly arbitration agreement that required them to refrain from doing something that might be legally done, which was litigating any disputes that arose. When they subsequently entered into the St. Matthews arbitration agreement, each gave up their contractual obligation to arbitrate. They could not litigate disputes up until that point.

Similarly, we are not moved by GGNSC's argument that any ambiguity should be resolved in favor of arbitration because that argument does not take into account the first step of

determining whether the parties agreed to arbitrate a dispute and the scope of the agreement. Of course, "[w]hile ambiguities in the language of the agreement should be resolved in favor of arbitration, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (internal citations omitted). The intent of the parties is apparent here, and disregarding that intent would be improper as a matter of contractual interpretation even in light of the policy favoring arbitration. "Arbitration under the Act is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489. U.S. 468, 479 (1989); *cf. Glazer v. Lehman Bros.*, 394 F.3d 444, 460 (6th Cir. 2005) ("[A] fundamental concept of contract law [states] that parties may agree to discharge or terminate a contract in favor of creating a second agreement to replace the former, and, when that occurs, the initial agreement is superseded and is no longer enforceable as to any party thereto.").

In sum, the second agreement constitutes an implied novation because it is manifestly inconsistent with the first agreement and rendered it impossible of performance. The estate has no obligation to arbitrate.

Alternatively, we could affirm the district court without touching the question of novation. As counsel reminded us at oral argument, Badgett could unilaterally revoke the arbitration agreement in writing within 30 days of signing. Another way of thinking about Badgett's signature on the St. Matthews arbitration agreement is that he exercised that right: Within 30 days—indeed, within minutes—of signing the St. Matthews admissions agreement (which renewed the Mt. Holly arbitration agreement), Badgett unilaterally withdrew any consent to arbitrate.

## III. CONCLUSION

No valid agreement to arbitrate exists between the parties. We **AFFIRM** the denial of the motion to compel arbitration and the granting of the motion to dismiss.