NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0319n.06

No. 20-6307

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CHARLEY BARBER; GLENDEL "BUDDY" HARDISON; BRIAN KEITH CASEBIER; STEVE DEMOSS; JOHN ELLIS SCOTT; DWIGHT FULKERSON, | ) ) ) ) ) | **FILED** Jul 07, 2021 DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| ARCH INSURANCE COMPANY, | ) ) | |
| Defendant-Appellee. | ) ) ) | |

BEFORE: SUTTON, Chief Judge; DAUGHTREY and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

The Department of Justice has indicted several former employees of Armstrong Coal Company for conspiring to submit fraudulent coal-dust samples to federal regulators. The merits of those charges are not before us. Instead, we must decide only who will pay the defense costs of that proceeding: the employees or Armstrong's insurer, Arch Insurance Company. The employees sought defense from Arch, the insurer denied their claims, and the employees sued to compel coverage. The district court granted summary judgment in favor of Arch. Because we agree that a pollution exclusion bars coverage of the employees' claims, we affirm.

I.

Mining coal creates coal dust, and inhaling coal dust causes "black lung." To prevent miners from contracting black lung, the Department of Labor's Mine Safety and Health Administration ("MSHA") limits the concentration of coal dust that can be in the air in a mine and requires coal companies to monitor and report their dust levels. *See, e.g.*, 30 C.F.R. §§ 70.100, 70.201–212. If a mine is too dusty or the coal company fails to follow the MSHA's regulations, the agency can halt production and assess fines.

Armstrong Coal Company was subject to these monitor-and-report requirements but had a checkered history of compliance. And according to the Department of Justice, Armstrong's coal-dust violations were intentional. In 2018, a federal grand jury indicted eight Armstrong employees on one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Plaintiffs in this case are among those charged.

According to the superseding indictment, the employees conspired together to falsify coal-dust samples. Members of the conspiracy then certified these fraudulent samples and submitted them to the MSHA. The criminal case against the employees is pending in the Western District of Kentucky, *United States v. Barber*, Case No. 4:18-cr-00015 (W.D. Ky. filed July 11, 2018), and a jury trial is scheduled for August 2021.

Throughout the criminal proceedings, the employees have sought defense against their charges from Armstrong's insurer, Arch Insurance Company, under the coal company's directors, officers, and organization liability insurance policy (the "D&O Coverage"). Generally, the policy provided that Arch would pay any Armstrong employee's defense costs related to a criminal proceeding that resulted from the employee's wrongful act.

Arch denied the employees' claims, concluding that a pollution exclusion barred coverage. As explained in detail below, this exclusion provided that Arch would not be liable for any claim "arising from, based upon, or attributable to" any discharge (or threat of discharge) of any "pollutant" or any "direction, request or voluntary decision" to test for or monitor any "pollutant." Arch determined that coal dust was a "pollutant" and that the criminal proceedings arose from a direction to monitor and test for coal dust. Arch therefore applied the exclusion to deny coverage.

The employees then filed this lawsuit against Arch in Kentucky state court, alleging claims for breach-of-contract, violation of Kentucky's Unfair Settlement Practices Act, and bad-faith denial of insurance coverage. Arch removed the lawsuit to federal court based on the parties' diversity of citizenship, and the parties filed cross-motions for summary judgment. The district court held that the pollution exclusion precluded coverage of the criminal action. The court also concluded that, absent a contractual obligation to provide coverage, plaintiffs could not proceed on their claim of bad faith. Accordingly, the district court granted summary judgment in favor of Arch. Plaintiffs filed this timely appeal.

## II.

This Court reviews a grant of summary judgment de novo, *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017), and applies Kentucky law in this diversity action, *Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 995 (6th Cir. 2012). Because no facts are disputed, this case turns on the "[i]nterpretation and construction of an insurance contract," which is a "matter of law for the court." *Kemper Nat. Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky. 2002). "When the terms of an insurance contract are unambiguous and not unreasonable, they will be enforced." *Ky. Ass'n of Ctys. All Lines Fund Tr. v. McClendon*, 157 S.W.3d 626, 630 (Ky. 2005).

But if a policy provision is ambiguous either on its face or as applied to a particular claim, *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 227 (Ky. 1994), two "cardinal principles" guide our inquiry: "(1) the contract should be liberally construed and all doubts resolved in favor of the insureds; and (2) exceptions and exclusions should be strictly construed to make insurance effective." *Ky. Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992). This second principle means that "[w]here an exclusion is susceptible to two reasonable interpretations, the interpretation favorable to the insured is adopted." *St. Paul Fire & Marine Ins. Co.*, 870 S.W.2d at 226. That said, Kentucky's preference for liberal construction of ambiguous insurance policies "does not mean that every doubt must be resolved against [the insurer] and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract."

## III.

Armstrong's D&O coverage required Arch to "pay Non-Indemnifiable Loss on behalf of the Insured Persons resulting from a Claim first made against the Insured Persons during the Policy Period or Extended Reporting Period, if applicable, for a Wrongful Act by the Insured Persons." Many of the terms used in this grant of coverage are defined in the policy. "'Loss' means the amount that the Insureds are legally obligated to pay resulting from a Claim, including . . . Defense Costs[.]" "Insured Person" includes any Armstrong employee. The definition of Claim includes any "criminal proceeding commenced by the return of an indictment, information or similar pleading." And "Wrongful Act" means "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by Insured Persons in their capacity as such[.]" Putting these pieces together, the D&O coverage seems to apply here because plaintiffs are

Armstrong employees who are seeking coverage for the defense costs resulting from a criminal proceeding that is premised on alleged fraudulent acts performed in their capacity as employees.

Despite this seemingly broad initial grant of coverage, the policy provided that Arch "shall not pay Loss for any claim against an Insured" "arising from, based upon, or attributable to any:

> a. discharge, dispersal, release, escape, seepage, migration or disposal of Pollutants, nuclear material or nuclear waste or any threat of such discharge, dispersal, release, escape, seepage migration or disposal; or
>
> b. direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants, nuclear material or nuclear waste[.]"

Arch and the district court concluded that this pollution exclusion applied to the employees' claims, so they were not entitled to coverage. Plaintiffs resist this conclusion for two reasons. First, they argue that coal dust is not a "pollutant" as that term is defined in the policy. Second, they argue that the criminal proceeding is not "arising from, based upon, or attributable to" any of the excluded categories of claims. We address each argument in turn.

A.

The policy defines "Pollutant[]" as

> any solid, liquid, gaseous, biological, radiological or thermal contaminant or irritant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals, mold, fungi, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos containing products, waste or any electric, magnetic, or electromagnetic field of any frequency. "Waste" includes, without limitation, material to be recycled, reconditioned, or reclaimed.

The employees first argue that "[t]he mere presence of coal dust in a coal mine, where it is supposed to be, does not and should not bar coverage under the Policies." According to the employees, substances are not pollutants if they are "used for their intended purposes, used in an appropriate confined space, or when they are disposed of properly." To support this argument, employees rely on a Delaware trial court case, *Mine Safety Appliances Co. v. AIU Ins. Co*., N10C-

07-241 MMJ, 2016 WL 498848 (Del. Super. Ct. Jan. 22, 2016). There, the court noted that a pollutant could be "virtually any substance, including many useful and necessary products" such as "radiation used in medical x-rays, chlorine bleach used for cleaning, petroleum products used for lubrication in automobiles, and acid used in tanning leather." The Delaware court determined that a substance becomes a "pollutant" "upon discharge, dispersal, release or escape." *Id.* Because the coal dust here never left the mine, the employees argue that it cannot be considered a pollutant. In their view, "coal dust will not qualify as a pollutant when it remains confined to the space in which it belongs."

There is, however, an important distinction between *Mine Safety Appliances Co.* and this case. Here, the parties have already agreed on how to define "pollutant," so the context-based definition crafted by the Delaware court does not apply. The question before us is not really whether coal dust is generally a pollutant, but rather whether coal dust is a "contaminant or irritant," terms that do not fit the employees' proposed wrong-place test. We reject the employees' attempt to narrow the policy's definition of pollutant beyond what the contractual language allows.

Next, the employees concede that "coal dust may be considered a contaminant or irritant, especially when released into an environment where it does not belong," but argue that "it should not automatically be considered one under Kentucky law." This point is well-taken; the Kentucky Court of Appeals has endorsed a "case-by-case" approach to determining whether coal dust falls within a pollution exclusion. *See Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 681 (Ky. Ct. App. 1996); *Certain Underwriters at Lloyd's, London v. Abundance Coal, Inc.*, 352 S.W.3d 594, 598 (Ky. Ct. App. 2011).

This approach encompasses three factors. First, we ask whether "other judges have held alternative interpretations of the same language to be reasonable[.]" *Abundance Coal*, 352 S.W.3d

at 598 (quoting *RSJ*, 926 S.W.2d at 681). Second, we apply "the basic premise that terms used in insurance contracts should be given their ordinary meaning as persons with the ordinary and usual understanding would construe them." And third, we consider the "practical consequences of the way in which we apply a provision."

For the first factor, the employees rely heavily on *RSJ* and *Abundance Coal*, asserting that "[t]he contracts at issue in [those cases] both utilized similar language for pollutants and for the pollution exclusion here." But this policy is substantially different from those contracts, so those courts' ambiguity findings do not extend to this case. Whereas those pollution exclusions applied only to circumstances involving the actual or threatened discharge of pollutants, *see RSJ*, 926 S.W.2d at 680; *Abundance Coal*, 352 S.W.3d at 597, the exclusion here also applies to regulatory activities involving pollutants. In fact, the *RSJ* and *Abundance Coal* courts stressed that the exclusions at issue there used "environmental terms of art" (such as "discharge," "dispersal," "seepage," "migration," "release," and "escape"), which "reflected the exclusion's historical objective—avoidance of liability for environmental catastrophes related to intentional industrial pollution." *Abundance Coal*, 352 S.W.3d at 598. Here though, the exclusion applies to claims beyond that historical objective—those that arise from a "direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants." The presence of an additional exclusionary category indicates that "pollutant" means something different here; it is not only a substance that actively pollutes, but also a substance that is regulated because of its potential to pollute. Given the strict monitor-and-report requirements imposed by the MSHA, coal dust falls within the scope of this term.

Similarly, we conclude that an ordinary person would consider coal dust to be a contaminant or irritant under these circumstances. "Contaminant" means "[t]hat which

contaminates," *Contaminant*, Oxford English Dictionary (2d ed. 1989), and "contaminates" means "[t]o render impure by contact or mixture; to corrupt, defile, pollute, sully, taint, infect," *Contaminate*, Oxford English Dictionary (2d ed. 1989). Coal dust renders the air in the mine impure, which is why the miners' inhalation of that air must be monitored. Likewise, the relevant definition of "irritant" is "a poison, etc. which produces irritation," *Irritant*, Oxford English Dictionary (2d ed. 1989), and an "irritation" is an "[e]xcitement of a bodily part or organ to excessive sensitiveness or morbid action." *Irritation*, Oxford English Dictionary (2d ed. 1989). Coal dust irritates miners' lungs, causing a morbid condition—black lung.

Moreover, as the district court noted, other authority supports the conclusion that an ordinary person would consider coal dust to be a contaminant or irritant under these circumstances. The Occupational Safety and Health Administration has classified coal dust as an "air contaminant." *See* 29 C.F.R. § 1910.1000. The employees argue that this regulation does not matter because it "deals specifically with exposure limits." But exposure limits exist because coal dust is harmful to inhale (i.e., it contaminates and irritates lungs).

For Congress's part, it has "recognized that coal dust inhalation causes permanent damage." *Plesh v. Director, OWCP*, 71 F.3d 103, 108 (3d Cir. 1995) (referring to enactment of the Black Lung Benefits Reform Act of 1977). And courts have often classified coal dust and similar material as a contaminant or irritant for the purposes of a pollution exclusion. *See Certain Underwriters at Lloyd's of London v. NFC Mining, Inc.*, 427 F. App'x 404, 405 (6th Cir. 2011) (holding that coal dust was a "solid irritant" and therefore included in a pollution clause that "exclude[d] injuries or damages caused by 'any solid, liquid, gaseous, or thermal irritant or contaminant'"); *U.S. Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 33 (6th Cir. 1988) ("The pollution exclusion at issue here provides that the policy does not apply to injuries or damage

arising from the discharge or release of pollutants. It is clear that this . . . clause calls off any obligations to provide coverage in cases . . . where the damages are caused by the discharge of coal dust."); *see also RLI Ins. Co. v. Gonzalez*, 411 F. App'x 696, 698 (5th Cir. 2011) (concluding that silica dust is "unambiguously" an irritant or contaminant under the language of a pollution exclusion); *Grizzly Processing, LLC v. Wausau Underwriters Ins. Co.*, No. 7:08-226-KKC, 2010 WL 934250, at *5 (E.D. Ky. Mar. 11, 2010) ("There can be no doubt that 'coal dust' is an irritant or contaminant"). Thus, under these circumstances, the ordinary and common understanding of contaminant and irritant includes coal dust.

As to the third factor, which goes to the practicality of an interpretation, the employees argue that classifying coal dust as a pollutant would "render the insurance policy illusory," and mean that many hazardous-material businesses "have purchased insurance coverage that will be ineffective and will not protect them." Kentucky courts have indeed warned of the "absurd consequences that would result from a blind application of the literal terms of the pollution exclusion." *Abundance Coal*, 352 S.W.3d at 599 (quoting *RSJ*, 926 S.W.2d at 682). This is because "[t]he terms 'irritant' and 'contaminant,' when viewed in isolation, are virtually boundless, for there is virtually no substance or chemical in existence that would not irritate or damage some person or property." *Id*. (quotation marks omitted).

No absurdity results from concluding that coal dust is a contaminant or irritant under the terms of these policies and the circumstances of these claims. The scope of this pollution exclusion is broader than usual because it includes claims arising from Armstrong's regulation of contaminants and irritants. Because coal dust contaminates and irritates, and because it is regulated by Armstrong, it fits comfortably within the exclusion's intended scope. Even if Armstrong or its employees did not expect the exclusion to apply to a necessary byproduct of its

sole commercial activity, "the language of an insurance policy, not an insured's expectations, controls disputes over the meaning of a policy." *NFC Mining*, 427 F. App'x at 405 (citing *Woodson v. Manhattan Life Ins. Co. of N.Y.*, 743 S.W.2d 835, 839 (Ky. 1987)).

We also note that the absurd situations warned of by Kentucky courts are not comparable to the facts of this case. The *RSJ* court offered two hypotheticals for when a literal interpretation of a pollution exclusion would cause a result outside the clause's intended scope:

> Take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants and contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution . . . .

*RSJ*, 926 S.W.2d at 682 (quoting *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 621–22 (Md. 1995)). Here, we do not have a substance that has caused damage outside its noxious capacity or a situation where the substance's intended use caused an unusual reaction. Instead, we are dealing with a byproduct that has no intended purpose and that is regulated precisely because of its inherent ability to pollute, contaminate, and irritate. Put simply, this is not a situation where courts hesitate to apply the literal terms of a pollution exclusion.

B.

The employees next argue that their criminal charges are not "arising from, based upon, or attributable to any . . . direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants[.]" They focus on the phrase "arising from," and argue that this language requires causality. In their view, the filing of criminal charges was not caused by Armstrong's duty to regulate coal dust; the prosecution was instead caused by a "conspiracy to commit fraud."

Kentucky courts recognize the phrase "arising out of" as requiring a causal connection. *See Hugenberg v. W. Am. Ins. Co./Ohio Cas. Grp.*, 249 S.W.3d 174, 186 (Ky. Ct. App. 2006). However, this phrase is "broad, general," and "construed expansively." *Id*. (citing *Ins. Co. of N. Am. v. Royal Indem. Co*., 429 F.2d 1014, 1017–18 (6th Cir. 1970)). And "arising from" "does not require a direct proximate causal connection but instead merely requires some causal relation or connection." Steven Plitt *et al*., *Couch on Insurance* § 101:52 (3d ed. 2020).

There is a causal connection between the criminal proceedings and a direction to test for and monitor coal dust. The MSHA, through its regulations, directed Armstrong and its employees to test for and monitor the level of atmospheric coal dust in the mines. *See, e.g*., 30 C.F.R. §§ 70.100, 70.201–212. Because Armstrong had to adhere to MSHA regulations (or face a shutdown or fines), the employees "conspired to commit dust fraud by knowingly and willfully altering the company's required dust-sampling procedures, by circumventing the dust-sampling regulations, submitting false samples, and by making false statements on dust certification cards."

To be sure, there are likely other causes that also contributed to the criminal charges, such as the conspiracy itself and the unsatisfactory conditions in the mines. After all, if the employees had submitted honest samples of a dusty mine or if the mine had been clean enough to pass muster without resorting to fraud, prosecutors likely would not have pressed charges. But for a claim to arise from a direction to test for or monitor coal dust, it need only have *some* causal connection to those regulatory requirements. Absent the MSHA's regulations, the employees would not have had to monitor or submit samples at all, and therefore would not have conspired to commit fraud against the United States. Accordingly, the criminal proceedings arose from a direction to test for or monitor a pollutant, and the pollution exclusion bars coverage for the criminal proceedings.

IV.

Our conclusion that the employees are not entitled to coverage under the policies disposes of the employees' ancillary arguments. They argue that even if Arch does not have a duty to indemnify, it has a duty to defend. But as explained above, the pollution exclusion relieves Arch of *any* duty related to the employees' claims. And the Kentucky Supreme Court has squarely rejected the employees' other argument that they can proceed on a bad-faith denial claim even if they are not entitled to coverage. *See Travelers Indem. Co. v. Armstrong*, 565 S.W.3d 550, 568 (Ky. 2018) ("Without that obligation [to provide coverage], the bad faith claim must fail as a matter of law.").

V.

We affirm the district court's judgment.